## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF SOUTH DAKOTA, CENTRAL DIVISION

| | |
|---|---|
| INSTITUTE FOR FREE SPEECH, | |
| *Plaintiff*, | CIV. 18-3017 |
| *v.* | |
| MARTY JACKLEY, in his official capacity as South Dakota Attorney General, and | **BRIEF IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| SHANTEL KREBS, in her official capacity as South Dakota Secretary of State, | |
| *Defendants*. | |

COMES NOW, Plaintiff Institute for Free Speech (the "Institute" or "IFS") and, pursuant to Federal Rule of Civil Procedure Rule 65, respectfully submits this Brief in Support of Motion for a Temporary Restraining Order and a Preliminary Injunction.

## <u>INTRODUCTION</u>

Among its other activities, IFS publishes studies concerning the impact of proposed government policies on citizens' rights of "core political speech." Verified Compl. ("VC") ¶¶ 12, 15-22. South Dakota currently has measures on the ballot that may restrict those rights. IFS brings the current action because South Dakota's existing legal regime inhibits IFS's planned legal analysis of those measures—not political ads, but rather a substantial publication that would examine the measures at length, but would not urge voters to cast their ballots in any particular way. *Id*.

1

South Dakota law burdens IFS's publication in two ways. First, the state's effort to regulate any "communication[] *concerning* . . . ballot questions" poses insurmountable vagueness problems and sweeps far broader than can be justified by any relevant governmental interest. S.D. Codified Laws § 12-27-1(11) (emphasis added). Second, these laws unconstitutionally require IFS to convey the government's message, including a list of its top five contributors. Because South Dakota does not require any connection between a listed donor and the regulated communication, this requirement will inevitably capture donors who gave to generally support IFS, and who had no involvement with, or even prior notice of, IFS's publication. Consequently, listing them as the "sponsors" of IFS's published work will affirmatively mislead the public, while necessarily doing nothing to help inform the state's voters. The First Amendment does not permit the state to impose these burdens on the right to speak and publish.

Fifty-two years ago, in *Mills v. Alabama*, the Supreme Court noted:

> Whatever differences may exist about interpretation of the First Amendment, there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion of governmental affairs. This of course includes discussion of . . . structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.

384 U.S. 214, 218-19 (1966).

The *Mills* case concerned an instance where the Court found unconstitutional criminal liability for an editor who published an editorial on election day in contravention of an Alabama law that made it a crime "'to do any electioneering or to solicit any votes . . . in support of or in opposition to any proposition that is being voted on on [sic] the day on which the election affecting such candidates *or propositions is being held*.'" *Id*. at 216 (quoting the then contemporary section of the Alabama Corrupt Practices Act) (emphasis added). The Court easily found these measures unconstitutional under the First Amendment's Press and Speech Clauses. *Id*. at 219. "The

Constitution specifically selected the press, which includes not only newspapers, books and magazines, but also humble leaflets and circulars [] to play an important role in the discussion of public affairs." *Id*. That role is specifically at issue in this case, as IFS's publications face regulatory chilling of IFS's core speech and press rights.

"Suppression of the right of the press . . . to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id*. IFS faces muzzling by South Dakota. Similar to the editor and editorial at issue in *Mills*, IFS will imminently publish analyses of two pending South Dakota ballot measures: Constitutional Amendment W[1] and Initiative 24.[2] VC ¶ 19. Commentary by publication "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills,* 384 U.S. at 219. South Dakota has criminal penalties that as described below run afoul of the First Amendment to the United States Constitution and are further unconstitutionally vague though they would impose criminal liability on political speech under circumstances in which IFS is engaging. VC ¶¶ 24-44. Consequently, the present motion asks for declaratory and injunctive relief regarding application of those laws. VC ¶ 50, Prayer for Relief.

---

[1] The text of pending South Dakota Constitutional Amendment W can be found at the following web address:
http://sdsos.gov/elections-voting/assets/2018_CA_CampaignFinLobbyingLaws_Petition.pdf (last visited October 4, 2018).
[2] The text of pending South Dakota Initiative 24 can be found at the following web address:
http://sdsos.gov/elections-voting/assets/2018_IM_Petition_ProhibitBQContributions.pdf (last visited October 4, 2018).

# BACKGROUND

## 1. The Institute for Free Speech and its Planned Publication

IFS is a § 501(c)(3) nonpartisan, educational charity dedicated to the defense of the rights to free speech and press protected by the First Amendment. IFS researches constitutional and practical implications of compelled disclosure laws, especially in the area of campaign finance regulation. VC ¶ 12. Additionally, IFS represents individuals and civil society organizations, *pro bono,* in cases raising First Amendment objections to burdensome regulation of core political speech. IFS intends to publish an analysis of two South Dakota ballot measures – proposed Constitutional Amendment W and Initiative 24[3] – with an emphasis on the ways in which those measures will impact citizens' First Amendment rights. IFS's publication will not urge passage or defeat of either measure. VC ¶ 2.

## 2. South Dakota Legal Background

South Dakota Laws[4] define an "independent communications expenditure" ("ICE") as any "expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person [or] entity" for any "communication[] *concerning* . . . ballot questions." S.D. Codified Laws § 12-27-1(11) (emphasis added). The statutory scheme broadly defines "Contribution" as a payment "made for the purpose of influencing" an election or "the adoption or defeat of any ballot question." S.D. Codified Laws § 12-27-1(6).

Regarding regulated actors under South Dakota Laws, "Person" is very narrowly defined as "a natural person." S.D. Codified Laws § 12-27-1(16). South Dakota broadly defines an "entity"

---

[3] *See supra* notes 1 & 2.
[4] Throughout this brief, when referencing the entire statutory scheme IFS uses the term "South Dakota Laws." When discussing individual provisions those provisions will be individually identified.

4

as "any organized or unorganized association, business corporation, limited liability company, nonprofit corporation . . . [or] any other entity of any kind, except a natural person that is, has been, or could be recognized by law; or any group of persons acting in concert that is not defined as a political committee in this chapter." S.D. Codified Laws § 12-27-1(15).

Any entity that spends more than $100 on an ICE is required to also publish the entity's top five contributors during the past year. S.D. Codified Laws § 12-27-16(1)(c). "[D]onated goods and services" (not otherwise defined) also count towards the $100 reporting threshold. S.D. Codified Laws § 12-27-16(2) (reporting requirements).

The mandated language is: "This communication is independently funded and not made in consultation with any candidate, public office holder, or political committee." S.D. Codified Laws § 12-27-16(1)(c). The mandated language must include a list of "'Top Five Contributors,' including a listing of the names of the five persons making the largest contributions in aggregate to the entity during the twelve months preceding that communication." *Id*. The term contributions applies to any donation, not just those, if any, that provide support specifically for the publication. The compelled language additionally must state the name of the organization, web address, and mailing address. S.D. Codified Laws § 12-27-16(1)(a) and (1)(b).

Failure to carry such a disclaimer is a "Class 2 misdemeanor" in the first instance and a "subsequent offense within a calendar year is a Class 1 misdemeanor." S.D. Codified Laws § 12-27-16(1)(c). Class 2 misdemeanors carry the possibility of "thirty days imprisonment in a county jail or five hundred dollars fine, or both." S.D. Codified Laws § 22-6-2(2). Class 1 misdemeanors carry a year imprisonment in county jail and $2000 fines. S.D. Codified Laws § 22-6-2(1).

Even for an organization that is an "entity whose majority ownership is owned by, controlled by, held for the benefit of, or comprised of twenty or fewer persons" the reporting

statement must have the name and mailing address of "each person, partner, owner, trustee, beneficiary, participant, shareholder, or member who owns, controls, or comprises ten percent or more of the entity." S.D. Codified Laws § 12-27-16(4). Officers must also be disclosed, as South Dakota requires "the name and title of the person [*i.e.* natural person] filing the report, the name of its chief executive, if any, and the name of the person [*i.e.* natural person] who authorized the expenditures on behalf of the entity." S.D. Codified Laws § 12-27-16(3)(b).

There are limited exemptions to the ICE definition but they provide no relief here. For example, neither the "administration and solicitation of any contribution for a political action committee established by an entity" nor the "use of an entity's real or personal property located on its business premises for such purposes" is classified as an ICE. S.D. Codified Laws § 12-27-1(6). And the ICE "term does not include any communication by a person made in the regular course and scope of the person's business or ministry or any communication made by a membership organization solely to any member of the organization and the member's family." *Id*. "Ministry" is undefined in the South Dakota Code, however, raising a vagueness problem. "Membership organization" is similarly undefined and vague.

South Dakota also has a narrow media exemption: "Any news article, editorial endorsement, opinion or commentary writing, or letter to the editor printed in a newspaper, magazine, flyer, pamphlet, or other periodical not owned or controlled by a candidate or political committee" is exempted from ICE regulation. S.D. Codified Laws § 12-27-16(6)(a). The media exemption further relieves "editorial endorsement[s] or opinion[s] aired by a broadcast facility[.]" S.D. Codified Laws § 12-27-16(6)(b).

South Dakota law also exempts from ICE regulation "[a]ny communication by a person made in the regular course and scope of the person's business or ministry or any communication

6

made by a membership entity solely to members of the entity and the members' families." S.D. Codified Laws § 12-27-16(6)(c).

The state further exempts communications referring to *candidates* when describing a bill. S.D. Codified Laws § 12-27-16(6)(d) (exempting "[a]ny communication that refers to any candidate only as part of the popular name of a bill or statute"). And South Dakota has an exemption for polling, so long as the questions "do[] not expressly advocate for or against a candidate, public office holder, ballot question, or political party." S.D. Codified Laws § 12-27-16(6)(e).

### 3.  Consequences of South Dakota Law Regarding IFS's Activity

None of the exemptions just covered in the previous section apply to an academic or legal analysis of a proposed ballot question, which is IFS's intended activity at issue in this case. Nor can IFS receive any guidance from the state to ascertain its exposure to criminal penalties.

South Dakota Code Law §1-11-1 covers the duties of the Attorney General. Subsection (6) is the only grant of power for advisory opinions, and such opinions are limited to a set of state officers and officials. The law empowers the Attorney General to:

> [G]ive his opinion in writing, without fee, upon all questions of law submitted to him by the Legislature or either branch thereof, or by the Governor, auditor, or treasurer.

S.D. Codified Laws § 1-11-1(6).

In addition, the statute provides that Attorney General opinions will

> only be issued on questions of law relating to the official duties of the requesting officer. Opinions will be confined to actual questions, and not theoretical or hypothetical questions. Opinions will not be issued on any matter pending before any court, state administrative agency, or local government agency or body.

*Id*.

The Attorney General expressly declines to issue "opinions . . . on the constitutionality of statutes." *Id*.  The Attorney General also "reserves the right to deny any opinion request." *Id*.

South Dakota's Secretary of State similarly declines to offer any guidance:

> We do not give legal advice and will only offer to you what the statute says. What we say isn't the final say as the penalty for non-compliance is criminal which would fall to a State's Attorney or the Attorney General to enforce.

S.D. Sec. of State, "Communications Expenditures," https://sdsos.gov/elections-voting/campaign-finance/Independent_expenditures.aspx (last visited October 4, 2018). Moreover, even the South Dakota Secretary of State is ineligible to ask for an advisory opinion from the Attorney General. *Id*.

Consequently, as neither the Attorney General nor the Secretary of State can or will give advice to private organizations on the metes and bounds of South Dakota campaign finance law, IFS must obtain clarity from the Court or forego exercising its First Amendment rights.

## ARGUMENT

As set forth below, IFS is entitled to a temporary restraining order and preliminary injunction as it is likely to succeed on the merits of the pending challenge of South Dakota Laws. Moreover, South Dakota Laws pose immediate and irreparable harm to IFS, as both in content and vagueness they have an immediate chilling effect on IFS's speech. On balance, the equities weigh in favor of an injunction, as South Dakota Laws identify no governmental interests that would outweigh their chilling effect on IFS's speech. At the same time, the public interest is best served by a temporary restraining order and a preliminary injunction, as there is no legitimate governmental policy furthered by unconstitutionally infringing on the rights to free speech and a free press.

1. **Legal Standard for a Stay and/or Preliminary Injunction.**

The decision to grant preliminary injunctive relief is left to the sound discretion of the District Court. *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008). The standard for granting a preliminary injunction in the Eighth Circuit involves consideration of the following four factors:

(1)    the likelihood that the movant will succeed on the merits of its claims;
(2)    the threat of irreparable harm to the movant;
(3)    the balance of harms between the movant's injury and any harm that granting the injunction will inflict upon the adverse party; and
(4)    the public interest.

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012); *Dataphase Systems, Inc. v. CL Systems, Inc*., 640 F.2d 109, 114 (8th Cir. 1981). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012).  The "'likelihood of success on the merits will often be the determinative factor'" in cases involving laws that burden fundamental First Amendment rights. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (citation omitted), *aff'd*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

2. **IFS is Likely to Succeed on the Merits.**

When evaluating a movant's likelihood of success on the merits, courts should "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Calvin Klein Cosmetics Corp.,* 815 F.2d 500, 503 (8th Cir. 1987) (quoting *Dataphase,* 640 F.2d at 113) (internal quotation marks omitted). At this preliminary stage, the

Court need not decide whether the party seeking the temporary restraining order will ultimately prevail. *PCTV Gold, Inc. v. SpeedNet, LLC,* 508 F.3d 1137, 1143 (8th Cir. 2007). Although a temporary restraining order cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty percent likelihood that he will prevail on the merits.'" *Id.* (quoting *Dataphase,* 640 F.2d at 113). The Eighth Circuit has also held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant." *S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir.1992). "Because success on the merits is the *sine qua non* of the preliminary injunction analysis in the First Amendment context, a discussion of the other factors is unnecessary." *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 989 F. Supp. 2d 182, 192 (D. Mass. 2013) (citing *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012)).

In this case, the Plaintiff is likely to succeed in setting aside the South Dakota provisions because, at a minimum: (i) IFS's intended publications constitute press subject to protections under the Press Clause of the Constitution, which South Dakota Laws violate by abrogating, inhibiting, and chilling—without sufficiently narrow tailoring and without a compelling governmental purpose—IFS's ability to publish its analyses of South Dakota's proposed ballot measures; and (ii) South Dakota's Laws are unconstitutionally vague under the First Amendment and the Fourteenth Amendment's Due Process Clause of the United States Constitution. A likelihood of success on the merits of even one of these claims can be sufficient to justify injunctive relief. *See Nokota Horse Conservancy, Inc. v. Bernhardt,* 666 F.Supp.2d 1073, 1078–80 (D.N.D. 2009). This factor therefore weigh in favor of a temporary restraining order and preliminary injunctive relief.

### A. South Dakota Law Violates First Amendment Protections.

IFS's intended publications analyzing Constitutional Amendment W and Initiative 24 constitute press protected by the First Amendment's safeguards for Speech, Association and the Press. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352, 366-67 (2010)); *accord Citizens United v. Gessler*, 773 F.3d 200, 212, 215-16 (10th Cir. 2014). South Dakota Laws violates IFS's protections under the First Amendment, as IFS's planned publication activities are unconstitutionally regulated and chilled by operation of South Dakota Laws.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of people to peaceably assemble." U.S. Const. Amend. I. This prohibition is equally binding upon South Dakota under the Due Process Clause of Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925). With respect to the First Amendment's protections in general, and those of the Press Clause in particular, the Supreme Court has made it plain that as an original matter, "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by [inhibiting the] free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.*" Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 167-68 (2002) (citations and internal quotation marks omitted). "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. Griffin*, 303 U.S. 444, 452 (1938). That is because:

> There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. *We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers.*

*Gessler*, 773 F.3d at 212 (quoting *Citizens United*, 558 U.S at 352) (emphasis in *Gessler*).[5]

With respect to speech and association in this context, Supreme Court precedent makes clear: "[t]he constitutional right of association . . . stem[s] from the . . . recognition that '[e]ffective advocacy of both public and private points of view . . . is undeniably enhanced by group association.'" *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). Acting to safeguard this associational liberty, the Court noted explicitly that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Id.* at 66. The Court was further concerned with "the invasion of privacy of belief" generated by disclosure, given that "'[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.'" *Id.* (quoting *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring)).

In assessing the constitutionality of South Dakota Laws' disclosure requirements, this Court inquires whether they satisfy exacting scrutiny, as this is the standard the Supreme Court indicates is applied to such requirements. *See*, *e.g.*, *Doe v. Reed*, 561 U.S. 186, 196 ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'"); *Citizens United*, 558 U.S. at 366 ("The Court has subjected [disclaimer and disclosure] requirements to exacting scrutiny" (internal quotation marks omitted)); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (governmental interest in disclosure requirements "must survive exacting scrutiny" (internal quotation marks omitted)); *Buckley*, 424 U.S. at 64

---

[5] Indeed, the state, "by adopting media exemptions, expresses an interest not in disclosures relating to *all* electioneering communications and independent expenditures, but only in disclosures by persons unlike" the government's preferred speakers. *Id.* at 217 (emphasis in *Gessler*). Thus, the media exemption "cast[s] doubt on the validity and extent of the asserted governmental interest" in the first place. *Id.* at 216.

("Since *NAACP v. Alabama* [357 U.S. 449 (1958),] we have required that the subordinating interests of the State [in compelled disclosure] survive exacting scrutiny.").

Therefore, "when the law at issue is a disclosure law, . . . it is subject to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Minnesota Citizens*, 692 F.3d at 874-75 (Supreme Court citations and internal quotation marks omitted). For the law to pass muster there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United*, 558 U.S. at 366–67 (internal quotation marks omitted). "That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Reed*, 561 U.S. at 196 (internal quotation marks omitted). "As the Supreme Court recently reiterated when reviewing a disclosure law, 'there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed and the governmental interest must survive exacting scrutiny.'" *Minnesota Citizens*, 692 F.3d at 876 (quoting *Buckley*, 424 U.S. at 64) (citing *Davis*, 554 U.S. at 744).

But there is a difference between disclosure that is mandated as part of an after-action report, as opposed to the on-communication publicization of donors demanded by S.D. Codified Laws § 12-27-16(1)(c).VC ¶ 30. Because the on-communication disclaimer is a "government-drafted script[]," *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. __; 138 S. Ct. 2361, 2371 (2018), "proscribing the content of" IFS's publication, it is "subject to traditional strict scrutiny." *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979 (9th Cir. 2004). As the Ninth Circuit determined when it struck a law that "required certain groups or entities publishing 'any material or information relating to an election, candidate[,] or any question on a ballot' to reveal *on the publication* the names and addresses of the publications' financial sponsors," there is a

13

constitutional difference between "the reporting of funds used to *finance* speech," via after-the-fact reporting, as opposed to compelled disclosures "affect[ing] the *content of the communication itself.*" *Heller*, 378 F3d. at 981, 987 (emphases in original, quoting relevant statute). This fundamental "distinction between on-publication identity disclosure requirements and after-the-fact reporting requirements" is "constitutionally determinative," and necessitates a more rigorous standard of review of strict scrutiny of South Dakota's disclosure requirement in S.D. Codified Laws § 12-27-16(1)(c).  *Heller*, 378 F.3d at 991; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

Consequently, South Dakota Laws generally cannot survive the requisite exacting scrutiny and the on-communication requirement of S.D. Codified Laws § 12-27-16(1)(c) is compelled speech that cannot survive strict scrutiny. Overall, South Dakota Laws cannot be applied to the IFS's attempts to inform the public and further policy debate through its publications because the laws are not sufficiently tailored and do not serve a compelling governmental interest. Nowhere do South Dakota Laws identify interests even remotely relevant to the disclosure requirements identified above, either in S.D. Codified Laws §§ 12-27-1, 12-27-16, or in the criminal enforcement provisions for those sections and subsections, S.D. Codified Laws § 12-27-16(1)(c), 22-6-2(1)-(2).

Presumably, South Dakota may attempt to defend its Laws by stating that the disclosure requirements are justified by attempting to discern who is attempting to influence voters and discouraging corruption by making large independent expenditures known to the public, so citizens can make informed decisions in the political marketplace. Neither of these interests justify the

scope of South Dakota Laws nor would they satisfy the exacting scrutiny necessary to find those laws constitutional.

That is because "'[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.'" *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) ("*WRTL II*") (Roberts, C.J.) (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978)) (ellipsis in *WRTL II*, brackets added). These principles reflect the "'national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Buckley*, 424 U.S. at 14 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The Supreme Court has also emphasized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and that there is a "vital relationship between freedom to associate and *privacy in one's associations*." *NAACP*, 357 U.S. at 460-61, 462 (emphasis added).

This language recognizes two rights: (1) the right to engage in publicized debate concerning public policies and issues, and, to effectuate that right, (2) the right to associational privacy. Freedom of association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," such as registration and disclosure requirements and the attendant sanctions for failure to disclose. *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions"). In *NAACP v. Alabama*, the Supreme Court protected the right to privacy of association—there from disclosure of an organization's contributors—by subjecting "state action which may have the

15

effect of curtailing the freedom to associate . . . to the closest scrutiny." 357 U.S. at 460-61; *see also id*. at 462 (noting that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective . . . restraint on freedom of association"). In *Buckley*, the Supreme Court directly addressed both the associational rights discussed in *NAACP v. Alabama* and the "[d]iscussion of public issues," 424 U.S. at 14—now referred to as "issue advocacy" or "issue speech." *McConnell v FEC*, 540 U.S. 93, 190 (2003). The precedent requires "that the subordinating interests of the State . . . survive exacting scrutiny." *Id*. at 64 (footnote omitted, collecting cases).

As explained in both *Buckley* and *Citizens United*, the only interest that the government can assert to justify its disclosure requirements is the informational interest. *Buckley*, 424 U.S. at 81; *Citizens United*, 558 U.S. at 367. But the informational interest does not justify every regulation that the government asserts might provide some information to the government or the public. That is, its scope covers only specific information about specific political activity, not any information about politics or candidates. The government tried to obtain such broad information in *Buckley*, attempting "to achieve 'total disclosure' by reaching 'every kind of political activity' in order to ensure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Id*. at 76 (citations omitted). The *Buckley* Court recognized, however, that these broad aims coupled with vague provisions engendered the "potential for encompassing both issue discussion and advocacy of a political result," thus "reach[ing] groups engaged purely in issue discussion." *Id*. at 79.

In expressly addressing the evil of inhibiting issue speech like the Institute's proposed publications, the *Buckley* Court deemed disclosure appropriate *only*:

(1) when [organizations] make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a

16

candidate or political committee, *and* (2) when [organizations] make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.

*Id*. at 80 (emphasis added). That interest is absent here, and the associational and speech privacy rights are also neither protected (nor taken into account) by South Dakota Laws' broad reach.

That is precisely the problem with the South Dakota Laws. They reach IFS, a group purely engaged in issue discussion, and impose disclosure rules, with the force of criminal penalties, and with no tailoring to satisfy the demands of exacting scrutiny when restricting groups like IFS, in addition to possible other groups whose speech is informational and in no way a source of corruption. To make matters worse, the South Dakota Laws make no attempt to protect or tailor their requirements to protect the associational interests identified above. As such, they cannot meet the constitutional requirements of exacting scrutiny and, for the compelled speech of S.D. Codified Laws § 12-27-16(1)(c), strict scrutiny. Therefore, IFS is likely to succeed on the merits of its claim in Count One of the VC.

## B.  South Dakota Laws Are Unconstitutionally Vague.

IFS also has no way of knowing whether it must comply under the ICE requirements of South Dakota Laws or face criminal penalties, or whether by some chance interpretation they might avail themselves of the media exceptions identified above. IFS, as described above, has no recourse to seek safe harbor, or even guidance, from South Dakota's Attorney General or Secretary of State. It must chance criminal penalties if it is to speak. This is precisely the problem the vagueness doctrine is designed to address. It is the reason South Dakota Laws are unconstitutionally vague. And this Court should find IFS is likely to succeed on the merits of its alternative constitutional claim in Count Two of the VC.

Both the First and Fourteenth Amendment protect citizens from regulations, particularly those carrying criminal penalties, that are unconstitutionally vague. U.S. Const. Amends. I, XIV; *see generally Thomas v. Collins*, 323 U.S. 516 (1945) ("No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning."). South Dakota campaign finance law impermissibly blurs the line between candidate advocacy, which may be regulated, and issue advocacy, which generally cannot. *See Buckley*, 424 U.S. at 42. The vagueness problem is clear: government action unconstitutionally chills speech when it "blanket[s] with uncertainty whatever may be said[, compelling a] speaker to hedge and trim." *Id*. at 43 (quoting *Thomas*, 323 U.S. at 535).

Unconstitutional vagueness is apparent of the face of a statute or statutory scheme. *See id.* at 40-41, n.48. The Supreme Court has repeatedly held that "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *WRTL II.*, 551 U.S. at 468-469 (Roberts, C.J., controlling op.) (quoting same); In re *Primus*, 436 U.S. 412, 432 (1978) (quoting same); *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (quoting same); *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting same). For instance, in *Rankin v. McPherson*, the Supreme Court held that discussion of public policy must also be protected with this same "breathing space." 483 U.S. 378, 387 (1987) ("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected." (quoting *Bond v. Floyd*, 385 U.S. 116, 136 (1966))). Indeed, when it comes to discussion of policy,

"debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270. To give "First Amendment freedoms [the] breathing space [they need] to survive, government may regulate . . . only with *narrow specificity*." *Keyishian*, 385 U.S. at 604 (emphasis added, citations omitted). Vagueness is especially dangerous in the First Amendment context. *Buckley*, 424 U.S. at 77 ("[A]n even 'greater degree of specificity' is required" when "First Amendment rights are involved . . . ." (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974))).

> Here, South Dakota Laws define an "independent communications expenditure" as:
>
> an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication concerning a candidate or a ballot question which is not made to, controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee.

S.D. Codified Laws § 12-27-1(11).

Defining a category of regulable speech as "concerning a candidate or a ballot question" is unclear in the ballot initiative context. Does speech fall under South Dakota Laws' regulation as "concerning . . . a ballot question" only if it specifically discusses a ballot question by title, such as Amendment W? What if a publication merely mentions the title? What about talking about campaign finance regulation generally? Is discussing the constitutional concerns of banning American citizens from speaking—simply because they are from out-of-state—a discussion of a ballot question? Answering these questions is difficult, if not impossible, for IFS, especially when so many key terms are undefined. *See* VC ¶¶ 82-97.

With respect to language in this arena containing regulations wishing to reach speech activities "concerning" or "relative to" election issues, the Supreme Court has found such provisions essentially vague *per se*. *Buckley*, 424 U.S. at 79-80. As such, South Dakota Laws expressly pose a trap for the unwary. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning"). And, as discussed above,

organizations like IFS cannot get regulatory guidance from either the Secretary of State or the Attorney General. *See* VC ¶¶ 45-50. Consequently, there is no safe harbor for IFS before it wishes to speak. IFS's voice is silenced until it violates the law and enforcement proceedings begin.

Because the definition is so vague and broad, S.D. Codified Laws § 12-27-1(11) functions as "a content-based regulation of speech" which is "of special concern": "The vagueness of . . . a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-872 (1997); *cf. Fed. Commc'ns Comm'n v. Fox TV Stations, Inc.*, 567 U.S. 239, 254-255 (2012) (applying *Reno*). The remedy for vagueness is facial relief, the appropriateness of which is determined by analyzing the statute's effect on complainant's proposed conduct. *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

"The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment." *Id*. at 498. Here, the law concerns the discussion of public policy and is therefore at the height of the First Amendment's protections. *Republican Party v. White*, 416 F.3d 738, 748 (8th Cir. 2005) ("Protection of political speech is the very stuff of the First Amendment."). Because it makes speakers like IFS hedge and trim their speech, S.D. Codified Laws § 12-27-1(11) should be declared facially void for vagueness, as should the attendant criminal enforcement provisions for violating that provision.

### C. Absent an Injunction, the Plaintiff Will Suffer Irreparable Harm.

A preliminary injunction is warranted when, as here, "irreparable injury is likely in the absence of an injunction. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008). To demonstrate irreparable harm, "a party must show that the harm is certain and great and of such imminence that

there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. FCC,* 109 F.3d 418, 425 (8th Cir. 1996). The Supreme Court has directly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation and internal quotation marks omitted). The rights IFS and its members are restrained by South Dakota Laws expansive communication regulation. Such injury is irreparable. *Hobby Lobby*, 723 F.3d at 1145 (en banc), *aff'd*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). Consequently, this factor weighs in favor of a temporary restraining order and preliminary injunctive relief for IFS.

### D.  The Equities Weigh in Favor of an Injunction.

Absent intervention by this Court, IFS fears its proposed informational writing will trigger regulation and disclosure as an ICE. Without this Court's protection, IFS will have to remain silent. And while this case involves very real and important rights guaranteed by the First Amendment, at issue is only a small portion of South Dakota's campaign finance laws: a challenge to the ICE rules as applied to particular issue policy publications meant to inform public debate. The injunction would reach no further than the IFS's issue speech, like that proposed here. Therefore, while the public interest in upholding the IFS's rights is great, the relative impact on the administration of the balance of South Dakota's laws is slight.

The balance of harms favors IFS.  Consequently, this factor weighs in favor of a temporary restraining order and preliminary injunctive relief for IFS.

### E.  The Public Interest Favors a Preliminary Injunction.

Sister circuits dealing with the requirements for a preliminary injunction have held that "[v]indicating First Amendment freedoms is clearly in the public interest." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005). Since no party has an interest in the

enforcement of an unconstitutional law, the public interest is best protected by issuing a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engr's*, 645 F.3d 978, 997 (8th Cir. 2011). Consequently, this factor weighs in favor of a temporary restraining order and preliminary injunctive relief for IFS.

**<u>CONCLUSION</u>**

In light of the foregoing, Plaintiff respectfully requests the Court enter an Order enjoining application of the South Dakota Laws pending final determination of the merits of its Complaint.

Dated this 9th day of October, 2018.

Respectfully submitted,

REDSTONE LAW FIRM LLP


\_\_/s/ Jon Hansen_____
Jon Hansen
Lisa M. Prostrollo
101 N. Phillips Ave., Suite 402
P.O. Box 1535
Sioux Falls, SD 57101-1535
Telephone: (605) 331-2975
Facsimile: (605) 331-6473
jon@redstonelawfirm.com
lisa@redstonelawfirm.com


Allen Dickerson
Parker Douglas
Institute for Free Speech
124 S. West Street, Suite 201
Alexandria, VA 22314
Telephone: (703) 894-6800
Facsimile: (703) 894-6811
adickerson@ifs.org
pdouglas@ifs.org
 *Admission* Pro Hac Vice *pending*

*Counsel for Plaintiff Institute for Free Speech*