## 1IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF SOUTH DAKOTA, CENTRAL DIVISION

| | |
|---|---|
| INSTITUTE FOR FREE SPEECH, <br><br> *Plaintiff,* <br><br> *v.* <br><br> MARTY JACKLEY, in his official capacity as South Dakota Attorney General, and <br><br> SHANTEL KREBS, in her official capacity as South Dakota Secretary of State, <br><br> *Defendants.* | Civil Action No. 3:18-cv-3017-RAL <br><br> **AMENDED VERIFIED COMPLAINT** <br><br> Hon. Roberto A. Lange <br> U.S. District Judge, District of South Dakota |

### NATURE OF ACTION

1.      The Institute for Free Speech ("IFS") challenges for nonconformity with the First Amendment of the United States Constitution South Dakota's regulations regarding what the state denominates an "independent communications expenditure," S.D. Codified Laws § 12-27-1(11), and that provision's attendant reporting disclosure and on-communication disclaimer requirements, S.D. Codified Laws § 12-27-16 (collectively "South Dakota Laws").

2.      South Dakota Laws are vague regarding whether they apply to the IFS's planned educational publications about the constitutional and practical issues of two ballot measures. IFS intends to publish an analysis of two South Dakota ballot measures – proposed Constitutional Amendment W and Initiative 24 – with an emphasis on the ways in which those measure will impact citizens' First Amendment rights. IFS's publication will not urge passage or defeat of either measure.

3.      IFS also wishes to make substantially and materially similar communications, across a range of media, within 90 days of future South Dakota general elections.

4.      The uncertainty of S.D. Codified Laws § 12-27-1(11)'s reach and the burdens mandated by S.D. Codified Laws § 12-27-16 chill the speech of IFS, as South Dakota Laws place IFS in the uncertain position of wondering if publishing its analysis will force illegal and burdensome donor disclosure and compelled speech requirements on IFS or have IFS risk criminal liability.

5.      Compounding the vagueness problem for IFS, South Dakota law also does not allow private groups like IFS to obtain formal guidance from either the Attorney General or the Secretary of State. Consequently, a judicial declaration is the only way for IFS and its employees to obtain guidance whether they would face criminal liability under South Dakota Laws.

6.      In addition to vagueness problems, South Dakota Laws are not narrowly tailored to any state interest under strict and exacting First Amendment scrutiny and cannot be applied lawfully to the IFS's proposed analysis of South Dakota proposed law and constitutional amendment. A declaration from this Court is needed to assured that IFS may speak without fear of prosecution by South Dakota now and in the future.

7.      Therefore, this action seeks this Court's declaration that S.D. Codified Laws § 12-27-1(11) cannot be constitutionally applied to IFS's publication activity, and IFS seeks from the Court injunctive relief that the unconstitutional South Dakota Laws may not be applied to it.

## JURISDICTION

8.      This Court has jurisdiction because this action arises out of the First and Fourteenth Amendments to the United States Constitution. 28 U.S.C. § 1331 (federal question).

9.      This Court has jurisdiction because this action arises under Section 1 of the Civil Rights Act of 1871. *See* 42 U.S.C. §§ 1983, 1988; 28 U.S.C. § 1343(a).

10.     This Court has authority to grant relief under The Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201 and 2202.

## VENUE

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) ("a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located") and (b)(2) (the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

## PARTIES

12.     Plaintiff IFS is a § 501(c)(3) nonpartisan, educational charity dedicated to the defense of the political speech and press rights protected by the First Amendment.  As part of that mission, IFS researches constitutional and practical implications of federal and state compelled disclosure laws, especially in the area of campaign finance regulation. Additionally, IFS represents individuals and civil society organizations, *pro bono,* in cases raising First Amendment objections to burdensome regulation of core political speech.

13.     Defendant Marty Jackley, in his official capacity as South Dakota Attorney General, "shall investigate and prosecute any violation of the provisions of" South Dakota's campaign finance chapter. S.D. Codified Laws § 12-27-35. Violation of the specific statute challenged in this action brings criminal penalties, enforceable by the Attorney General. S.D. Codified Laws § 12-27-16(1)(c). Or, "[i]n lieu of bringing a criminal action, the attorney general may elect to file a civil action" to enforce any of the campaign finance laws. S.D. Codified Laws § 12-27-35. The Attorney General also has plenary power to inspect records of potential violators of South Dakota campaign finance law. S.D. Codified Laws § 12-27-3 ("The attorney general may, for the purpose of

enforcing the provisions of this chapter, inspect or examine any political committee records required to be maintained by this chapter.").

14.    Defendant Shantel Krebs, in her official capacity as South Dakota Secretary of State, has the power to administer fines for failure to timely file campaign finance reports or for lack of information on such reports. *See, e.g.*, S.D. Codified Laws § 12-27-29.2.

**FACTS**

**IFS's Publication Activity**

15.    Since its founding in 2005, IFS has studied and analyzed the effect of various campaign finance proposals and other compelled disclosure laws. As part of its mission, IFS has often used its expertise to craft publications addressing proposed legislation before the people, legislatures, and regulatory agencies nationwide. Campaign finance is a particularly complex area of the law, and expert analysis has proven helpful to make plain the effects (often unintended) of various public policy proposals.

16.    "Public charity" §501(c)(3) organizations like IFS may engage in only limited lobbying activity, including speaking to citizens about proposed legislation. 26 U.S.C. § 501(c)(3) ("no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation"); 26 C.F.R 1.501(c)(3)-1(3).

17.    An organization may elect treatment under Internal Revenue Code § 501(h), which permits it to spend a defined portion of its budget on lobbying (including grassroots lobbying). 26 U.S.C. § 501(h)(1)(B). IFS takes the § 501(h) election.

18.    Many of IFS's publications are lengthy, running dozens of footnoted pages and containing citations to cases nationwide. These comments are academic works to add to vibrant public policy discussion among the electorate, not campaign flyers. Examples of past work include comments

to the New Mexico Secretary of State and comments to the Idaho legislature. *See* Tyler Martinez, *Constitutional and Practical Issues with New Mexico Secretary of State Revised Proposed Rule 1.10.13 NMAC* (Aug. 29, 2017), http://ifs.org/wp-content/uploads/2017/08/2017-08-29_CCP-Comments_NM_Revised-SoS-Proposed-Rule-1.10.13-NMAC.pdf;            Tyler            Martinez, *Constitutional and Practical Issues with Idaho H. 573 (2017 Campaign Finance Reform Legislative Work Group Recommendations)* (Feb. 22, 2018), http://www.ifs.org/wp-content/uploads/2018/02/2018-02-22_IFS-Cover-Letter-Comments_ID_H.-573_CFR-Work-Group-Legislative-Recommendations.pdf.

19.     For South Dakota, IFS wishes and plans to publish analyses of Constitutional Amendment W and Initiative 24. But such publication may trigger registration, reporting, and disclosure requirements of S.D. Codified Laws § 12-27-16, as such lengthy, academic work may be considered as an "independent communication expenditure" under S.D. Codified Laws § 12-27-1(11).

20.     Campaign finance proposals have been before the South Dakota electorate in recent years, this year (in the form of Amendment W and Initiative 24), and likely for years to come. *See, e.g.,* S.D. Sec. of State, *2016 Ballot Questions* 9, https://sdsos.gov/elections-voting/assets/2016%20BQ%20PamphletCover.pdf (discussing Initiated Measure 22, "a measure to revise State campaign finance and lobbying laws"). Campaign finance policy is a perennial issue in South Dakota.

21.     IFS published its analysis regarding proposed Constitutional Amendment W and Initiative 24 on October 17, 2018, only because this Court entered a preliminary injunction, Doc. 21, which specified that IFS would not face criminal sanction for publishing without the requirements identified in paragraph 19. *Id.*

22.     IFS's analysis referenced in paragraph 21 can be found at: https://www.ifs.org/wp-content/uploads/2018/10/IFS-South-Dakota-Comments-Final-17-Oct-2018.pdf

23.     On October 18, 2018 IFS informed media outlets, both within and without South Dakota, of the publication referenced in paragraph 21of its analysis by means of an electronically distributed press release.

24.     IFS had over $100 in expenditures to publish its analysis referenced in paragraph 21.  These expenses included both internal overhead and an hourly payment to one of the analysis co-authors, specifically for his work on the analysis of the publication identified in paragraph 21.

25.     IFS will run substantially and materially similar analyses of future South Dakota campaign finance ballot measures in the coming years.

26.     Based on the amount that was spent on the October 17, 2018 publication, IFS reasonably anticipates that future analyses of South Dakota law will also exceed $100 in expenditures.

27.     Nevertheless, given the ambiguities of South Dakota Law, IFS may not publish without immanent fear of prosecution.

28.     IFS's president is Mr. David Keating, who oversees over a dozen employees of the nonprofit governed by less than twenty directors.

### The Statutory Provisions At Issue

29.     South Dakota defines an "independent communications expenditure" (ICE) as any "expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person [or] entity" for any "communication[] *concerning* . . . ballot questions." S.D. Codified Laws § 12-27-1(11) (emphasis added).

30.     It broadly defines "Contribution" as a payment "made for the purpose of influencing" an election or "the adoption or defeat of any ballot question." S.D. Codified Laws § 12-27-1(6).

6

31.     "Person" is very narrowly defined as "a natural person." S.D. Codified Laws § 12-27-1(16).

32.     South Dakota broadly defines an "entity" as "any organized or unorganized association, business corporation, limited liability company, nonprofit corporation . . . [or] any other entity of any kind, except a natural person that is, has been, or could be recognized by law; or any group of persons acting in concert that is not defined as a political committee in this chapter." S.D. Codified Laws § 12-27-1(15).

33.     "[D]onated goods and services" (not otherwise defined) also count towards the $100 reporting threshold. S.D. Codified Laws § 12-27-16(2) (reporting requirements).

34.     Any entity that spends more than $100 on an ICE is required to include a disclaimer identifying the entity's top five contributors during the past year. S.D. Codified Laws § 12-27-16(1)(c).

35.     The mandated disclaimer is: "This communication is independently funded and not made in consultation with any candidate, public office holder, or political committee." S.D. Codified Laws § 12-27-16(1)(c).

36.     By law, the disclaimer also requires a list of "'Top Five Contributors,' including a listing of the names of the five persons making the largest contributions in aggregate to the entity during the twelve months preceding that communication." *Id.*

37.     The disclaimer additionally must state the name of the organization, web address, and mailing address. S.D. Codified Laws § 12-27-16(1)(a) and (1)(b).

38.     Failure to carry such a disclaimer is a "Class 2 misdemeanor" in the first instance and a "subsequent offense within a calendar year is a Class 1 misdemeanor." S.D. Codified Laws § 12-27-16(1)(c).

39.     Class 2 misdemeanors carry the possibility of "thirty days imprisonment in a county jail or five hundred dollars fine, or both." S.D. Codified Laws § 22-6-2(2). Class 1 misdemeanors carry a year imprisonment in county jail and $2000 fines. S.D. Codified Laws § 22-6-2(1).

40.     Moreover, the reporting disclosure is burdensome because it negates constitutionally protected anonymity. And even for an organization like IFS, which is an "entity whose majority ownership is owned by, controlled by, held for the benefit of, or comprised of twenty or fewer persons," the reporting statement must have the name and mailing address of "each person, partner, owner, trustee, beneficiary, participant, shareholder, or member who owns, controls, or comprises ten percent or more of the entity." S.D. Codified Laws § 12-27-16(4).

41.     Officers of IFS would also be disclosed, as South Dakota requires "the name and title of the person [*i.e.* natural person] filing the report, the name of its chief executive, if any, and the name of the person [*i.e.* natural person] who authorized the expenditures on behalf of the entity." S.D. Codified Laws § 12-27-16(3)(b).

42.     There are limited exemptions to the ICE definition. For example, the "administration and solicitation of any contribution for a political action committee established by an entity" and "use of an entity's real or personal property located on its business premises for such purposes" are not classified as ICEs. S.D. Codified Laws § 12-27-1(6).

43.     And the ICE "term does not include any communication by a person made in the regular course and scope of the person's business or ministry or any communication made by a membership organization solely to any member of the organization and the member's family." *Id.*

44.     "Ministry" is undefined, however, raising a vagueness problem.

45.     "Membership organization" is similarly vague.

8

46.     South Dakota has a narrow media exemption: "Any news article, editorial endorsement, opinion or commentary writing, or letter to the editor printed in a newspaper, magazine, flyer, pamphlet, or other periodical not owned or controlled by a candidate or political committee" is exempted from ICE regulation. S.D. Codified Laws § 12-27-16(6)(a). The media exemption similarly relieves "editorial endorsement[s] or opinion[s] aired by a broadcast facility[.]" S.D. Codified Laws § 12-27-16(6)(b).

47.     South Dakota law also exempts from ICE regulation "[a]ny communication by a person made in the regular course and scope of the person's business or ministry or any communication made by a membership entity solely to members of the entity and the members' families." S.D. Codified Laws § 12-27-16(6)(c).

48.     South Dakota laws have an exemption for communications referring to candidates when describing a bill. S.D. Codified Laws § 12-27-16(6)(d) (exempting "[a]ny communication that refers to any candidate only as part of the popular name of a bill or statute").

49.     And the state has an exemption for polling, so long as the questions "do[] not expressly advocate for or against a candidate, public office holder, ballot question, or political party." S.D. Codified Laws § 12-27-16(6)(e).

50.     None of these exemptions apply to an academic or legal analysis of a proposed ballot question, which is IFS's intended activity at issue in this case.

**No Administrative Guidance Available to IFS**

51.     South Dakota Code §1-11-1 covers the duties of the Attorney General. Subsection (6) is the only grant of power for advisory opinions, and such opinions are limited to state officers and officials. The law empowers the Attorney General to:

> [G]ive his opinion in writing, without fee, upon all questions of law submitted to him by the Legislature or either branch thereof, or by the Governor, auditor, or treasurer.

S.D. Codified Laws § 1-11-1(6).

52.     Even the South Dakota Secretary of State is ineligible to ask for an advisory opinion from the Attorney General. *Id.* But the Attorney General states that he "may issue" opinions to "state departments, divisions, boards, bureaus or commissions, state's attorneys, other public officials, and counsel for public bodies." S.D. Attorney General, "Official Opinions: What are the Official Opinions of the Attorney General[?]" https://atg.sd.gov/OurOffice/OfficialOpinions/default.aspx. The plain language of this provision indicates that such guidance is perhaps available only to state functionaries and not private parties like IFS.

53.     Attorney General opinions will

> only be issued on questions of law relating to the official duties of the requesting officer. Opinions will be confined to actual questions, and not theoretical or hypothetical questions. Opinions will not be issued on any matter pending before any court, state administrative agency, or local government agency or body.

*Id.*

54.     Additionally, the Attorney General expressly declines to issue "opinions . . . on the constitutionality of statutes." *Id.* And the "Attorney General reserves the right to deny any opinion request." *Id.*

55.     While guidance is likewise unavailable from South Dakota's Secretary of State, even were such guidance available it would fail to provide safe harbor to IFS because of the clear provisions of South Dakota Laws.  South Dakota's Secretary of State expressly declines to offer any guidance on implementation of the law:

> We do not give legal advice and will only offer to you what the statute says. What we say isn't the final say as the penalty for non-compliance is criminal which would fall to a State's Attorney or the Attorney General to enforce.

S.D. Sec. of State, "Communications Expenditures," https://sdsos.gov/elections-voting/campaign-finance/Independent_expenditures.aspx.

56.    Because neither the Attorney General nor the Secretary of State can or will give advice to private organizations on the metes and bounds of South Dakota campaign finance law, IFS must obtain clarity from this Court or forego exercising its First Amendment rights or risk criminal penalty.

## CAUSES OF ACTION

### Count One:
### Violation of U.S. Constitution Amendment I and XIV
### Declaratory judgment regarding S.D. Codified Laws §§ 12-27-1(11) and 12-27-16.

57.    Plaintiff realleges and incorporates by reference paragraphs 1 through 56.

58.    In publishing its analysis of Constitutional Amendment W and Initiative 24, IFS would exercise its freedoms protected by the Speech, Press, and Association Clauses of the First Amendment to the United States Constitution. *See Citizens United v. Gessler*, 773 F.3d 200, 212, 215-16 (10th Cir. 2014) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352, 366-67 (2010)).

59.    South Dakota Laws unconstitutionally infringe on IFS's press rights as they abrogate, inhibit, and chill, without sufficient narrowly tailoring and without a compelling governmental purpose, IFS's ability to publicize its political views regarding South Dakota proposed ballot measures.

60.    With respect to the First Amendment's speech protections in general, and Press Clause in particular, the Supreme Court has made it pellucidly plain that as an original matter "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens."

*Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167-68 (2002) (citations and internal quotation marks omitted). "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. Griffin*, 303 U.S. 444, 452 (1938).

61.     Indeed, the Court notes that "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

62.     That is because "[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) ("*WRTL II*") (Roberts, C.J., controlling op.) (quoting *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978)) (ellipsis in *WRTL II*, brackets added).

63.     These principles reflect the "'national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Buckley*, 424 U.S. at 14 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

64.     The Supreme Court has also emphasized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and that there is a "vital relationship between freedom to associate and privacy in one's associations." *NAACP v. Ala.*, 357 U.S. 449, 460-61, 462 (1958).

65.     This language recognizes two rights: (1) the right to engage in publicized debate concerning public policies and issues, and, to effectuate that right, (2) the right to associational privacy. Freedom of association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," such as registration and

disclosure requirements and the attendant sanctions for failing to disclose. *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions").

66.     In *NAACP v. Alabama*, the Supreme Court protected the right to privacy of association—there from disclosure of an organization's contributors—by subjecting "state action which may have the effect of curtailing the freedom to associate . . . to the closest scrutiny." 357 U.S. at 460-61; *see also id.* at 462 (noting that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective . . . restraint on freedom of association").

67.     In *Buckley*, the Supreme Court directly addressed both the associational rights discussed in *NAACP v. Alabama* and the "[d]iscussion of public issues," 424 U.S. at 14—now referred to as "issue advocacy" or "issue speech," *McConnell v FEC*, 540 U.S. 93, 190 (2003).

68.     The *Buckley* Court confronted a statute that "require[d] direct disclosure of what an individual or group contributes or spends." *Id.* at 75.

69.     The *Buckley* Court stated, "[i]n considering this provision we must apply the same strict standard of scrutiny, for the right of associational privacy developed in *NAACP v. Alabama* derives from the rights of the organization's members to advocate their personal points of view in the most effective way." *Id.*; *see also id.* at 66 (noting "[t]he strict test established by *NAACP v. Alabama* is necessary because compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights").

70.     Thus, the Court required that "that the subordinating interests of the State . . . survive exacting scrutiny." *Id.* at 64 (footnote omitted, collecting cases).

71.     Under exacting scrutiny, the Supreme Court "insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information to be disclosed." *Id.* (quoting *NAACP*, 357 U.S. at 463; *Bates*, 361 U.S. at 525). The Supreme Court has consistently applied this standard. *See, e.g., Doe v. Reed*, 561 U.S. 186, 196 (2010); *Citizens United*, 558 U.S. at 366; *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008).

72.     As explained in both *Buckley* and *Citizens United*, the only interest that the government can assert to justify its disclosure requirements is the informational interest. *Buckley*, 424 U.S. at 81; *Citizens United*, 558 U.S. at 367.

73.     To prevent government overreach into issue discussion and other protected speech, the Supreme Court has circumscribed the scope of the informational interest. The informational interest is not even an interest in any information about politics or candidates. The government tried to obtain such broadly defined information in *Buckley*, attempting "to achieve 'total disclosure' by reaching 'every kind of political activity' in order to ensure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Id.* at 76 (citations omitted).

74.     The *Buckley* Court recognized, however, that these broad aims coupled with vague provisions engendered the "potential for encompassing both issue discussion and advocacy of a political result," thus "reach[ing] groups engaged purely in issue discussion." *Id.* at 79.

75.     From the overly broad and vague statute before it, the Court constructed a "disclosure requirement [that was] narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced." *Id.* at 81. Consequently, the Supreme Court held that disclosure is constitutionally limited to "expenditures for communications that expressly advocate the election or defeat of a clearly identified

candidate," because the government's informational interest extended only to "spending that is unambiguously campaign related[.]" *Id.* at 80-81.

76.    This interest and its limited reach has not changed since *Buckley*, as demonstrated by the Supreme Court's decisions in *McConnell* and *Citizens United*. In *McConnell*, the record was replete with examples of "candidate advertisements masquerading as issue ads." 540 U.S. at 132 (citation and quotation marks omitted). Based on that obvious record, the Court upheld BCRA against a facial challenge, concluding that the law targeted the informational interest because it "require[d] organizations to reveal their identities so that the public is able to identify the source of the funding behind broadcast advertisements influencing certain elections [of identified candidates]." *Id.* at 196 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D.D.C. 2003) (Kollar-Kotelly, J.)).

77.    Similarly, the *Citizens United* Court explained that "disclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." *Citizens United*, 558 U.S. at 367 (quoting *Buckley*, 424 U.S. at 66)). Then, analyzing BCRA's disclaimer requirements as-applied to Citizens United's "pejorative" ads, the Court held that the requirements "'provid[ed] the electorate with information,' *McConnell*, [540 U.S.] at 196 . . . , and 'insure[d] that the voters [were] fully informed' about the person or group who is speaking [about identified candidates]." *Citizens United*, 558 U.S. at 368 (also citing *Buckley*, 424 U.S. at 76).

78.    Following this rule, in *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, the Eighth Circuit *en banc* struck down a law requiring independent expenditure funds to have "virtually identical regulatory burdens" to those imposed on political committees. 692 F.3d 864, 872 (8th Cir. 2012).

79.     In that case, "Minnesota ha[d], in effect, substantially extended the reach of [political committee]-like regulation to *all* associations that *ever* make independent expenditures." *Id.* (emphasis in original).

80.     Minnesota's regulations included having to file periodic reports, even if the fund no longer engaged in political activity. *Id.* at 873 ("Perhaps most onerous is the ongoing reporting requirement. Once initiated, the requirement is potentially perpetual regardless of whether the association ever again makes an independent expenditure.").

81.     Ultimately, the *Swanson* court required "the major purpose" test to ensure that only political organizations face that burden – and not organizations that lack such a major purpose. *Id.* at 877.

82.     Nor is the *en banc* Eighth Circuit an outlier. The decisions of other federal courts implementing this standard underscore that the informational interest extends only to "spending that is unambiguously campaign related." *Buckley*, 424 U.S. at 80-81. For example, in *Wisconsin Right to Life, Inc. v. Barland*, the Seventh Circuit stated that "[t]o protect against an unconstitutional chill on issue advocacy by independent speakers, *Buckley* held that campaign-finance regulation must be precise, clear, and may only extend to speech that is 'unambiguously related to the campaign of *a particular federal candidate*.'" 751 F.3d 804, 811 (7th Cir. 2014) (quoting *Buckley*, 424 U.S. at 80) (emphasis added).

83.     The Fourth Circuit also used *Buckley*'s unambiguously campaign related standard in finding North Carolina's "political committee" definition overbroad and vague. *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 290 (4th Cir. 2008).

84.     And, in the words of the Tenth Circuit, "[i]n *Buckley*, the Court held that the reporting and disclosure requirements . . . survived 'exacting scrutiny' so long as they were construed to reach

16

only that speech which is 'unambiguously campaigned related.'" *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 676 (10th Cir. 2010) (citing 424 U.S. at 79-81).

85.    The Fifth Circuit also agrees that disclosure must be tied to unambiguously campaign related activity. In examining the federal disclosure regime, the Eastern District of Louisiana upheld federal campaign fund coordination regulation by noting that "it is the act of coordination that . . . arguably make a communication 'unambiguously campaign related.'" *Cao v. Fed. Election Comm'n*, 688 F. Supp. 2d 498, 541 (E.D. La. 2010) *certified questions answered by som. nom. Republican Nat'l Comm. v. Fed. Election Comm'n (*In re *Anh Cao)*, 619 F.3d 410, 418 (5th Cir. 2010) ("*Buckley* does not permit non-campaign-related speech to be regulated.").

86.    Just two years before *Cao*, the District of Utah noted *Buckley*'s standard in examining a state disclosure regime: "Supreme Court precedent makes clear that campaign finance laws may constitutionally regulate only those activities that are unambiguously campaign related." *Nat'l Right to Work Legal Def. and Ed. Found. v. Herbert*, 581 F. Supp. 2d 1132, 1144 (D. Utah 2008) (citing *Buckley*, 424 U.S. at 80).

87.    South Dakota Laws cannot survive the requisite exacting scrutiny.  They cannot be applied to IFS's attempts to inform the public and further policy debate through its publications because the laws are not sufficiently tailored and do not serve a compelling governmental interest.

## Count Two:
### Violation of U.S. Constitution Amendments I and XIV
### Declaratory judgment regarding the facial invalidity of S.D. Codified Laws §§ 12-27-1(11) and 12-27-16 as Unconstitutionally Vague.

88.    Plaintiff realleges and incorporates by reference paragraphs 1 through 87.

89.    The First and Fourteenth Amendments protect citizens from regulatory exposure and criminal liability from statutes that are vague. U.S. Const. Amends I, XIV.

90.     South Dakota campaign finance law impermissibly blurs the line between candidate advocacy, which may be regulated, and issue advocacy, which generally cannot. *See Buckley*, 424 U.S. at 42.

91.     Government action unconstitutionally chills speech when it "blanket[s] with uncertainty whatever may be said[, compelling a] speaker to hedge and trim." *Id.* at 43 (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)).

92.     The Supreme Court has repeatedly held that "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. at 433; *WRTL II.*, 551 U.S. at 468-469 (Roberts, C.J., controlling op.) (quoting same); *In re Primus*, 436 U.S. 412, 432 (1978) (quoting same); *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (quoting same); *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting same).

93.     In *Rankin v. McPherson*, the Supreme Court held that discussion of public policy must also be protected with this same "breathing space." 483 U.S. 378, 387 (1987) ("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected") (quoting *Bond v. Floyd*, 385 U.S. 116, 136 (1966))).

94.     Indeed, when it comes to discussion of policy, "debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270. To give "First Amendment freedoms [the] breathing space [they need] to survive, government may regulate … only with *narrow specificity*." *Keyishian*, 385 U.S. at 604 (citations omitted, emphasis added).

95.     Vagueness is especially dangerous in the First Amendment context. *Buckley*, 424 U.S. at 77 ("[A]n even 'greater degree of specificity' is required" when "First Amendment rights are involved[.]") (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)).

96.     Here, S.D. Codified Laws § 12-27-1(11) defines an "independent communications expenditure" as:

> an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication concerning a candidate or a ballot question which is not made to, controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee.

97.     Defining a category of regulable speech as "concerning a candidate or a ballot question" is unclear, when taken to the ballot initiative context. Is discussing Amendment W specifically "concerning . . . a ballot question"? What about talking about campaign finance regulation generally? Is discussing the constitutional concerns of banning American citizens from speaking—simply because they are from out-of-state—a discussion of a ballot question? Answering these question is difficult, if not impossible, for IFS, especially when so many key terms are undefined. *See* ¶¶ 22-42.

98.     As such, South Dakota Laws pose a trap for the unwary. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning.")

99.     And, as discussed above, organizations like IFS cannot even get regulatory guidance either from the Secretary of State or from the Attorney General. *See* ¶¶ 43-48. Consequently, there is no safe harbor for IFS before it wishes to speak. IFS's voice is silenced until it knows if it is subject to compelled donor disclosure and other burdens.

100.    Because the definition is so vague and broad, S.D. Codified Laws § 12-27-1(11) functions as "a content-based regulation of speech" which is "of special concern" because "[t]he vagueness of . . . a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-872 (1997); *cf. Fed. Commc'ns Comm'n v. Fox TV Stations, Inc.*, 567 U.S. 239, 254-255 (2012) (applying *Reno*).

101.    The remedy for vagueness is facial relief, starting with analyzing the statute's effect on complainant's proposed conduct. *See Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

102.    "The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment." *Id.* at 498. Here, the law concerns the discussion of public policy and is therefore at the height of the First Amendment's protections. *Republican Party v. White*, 416 F.3d 738, 748 (8th Cir. 2005) ("Protection of political speech is the very stuff of the First Amendment.").

103.    Because it makes speakers like IFS hedge and trim their speech, S.D. Codified Laws § 12-27-1(11) should be declared facially void for vagueness.

## PRAYERS FOR RELIEF

Plaintiff IFS requests that judgment be entered in its favor and against South Dakota Marty Jackley and South Dakota Secretary of State Shantel Krebs, Defendants, as follows:

A.    A declaration that S.D. Codified Laws §§ 12-27-1(11) and 12-27-16 are not properly tailored to meet the requisite exacting scrutiny, as applied to the IFS's planned analyses of South Dakota's Constitutional Amendment W and Initiative 24.

B.    A declaration that the IFS's proposed activity—and materially and substantially similar activity in the future—is not regulable under S.D. Codified Laws §§ 12-27-1(11) and 12-27-16, in order to ensure that the constitutional infirmity of South Dakota Laws is not capable of repetition and evading judicial review.

C.    A declaration that S.D. Codified Laws § 12-27-1(11) is facially vague and therefore void under the First and Fourteenth Amendments of the United States Constitution.

D.       Such injunctive relief as this Court may direct to give effect to its declarations and judgments.

E.       Costs and attorneys' fees pursuant to 28 U.S.C. §§ 1983 and 1988, and any other applicable statute or authority.

F.       Any other relief this Court may grant in its discretion.


Dated this 7th day of December, 2018.

Respectfully submitted,

Jon Hansen
Lisa M. Prostollo
Redstone Law Firm LLP
101 N. Phillips Ave., Suite 402
P.O. Box 1535
Sioux Falls, SD 57101-1535
Telephone: (605) 331-2975
Facsimile: (605) 331-6473
jon@restonelawfirm.com
lisa@redstonlawfirm.com


Allen Dickerson
Parker Douglas
INSTITUTE FOR FREE SPEECH
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@ifs.org
*Admitted Pro Hac Vice*

*Counsel for Plaintiff Institute for Free Speech*

## VERIFICATION

STATE OF VIRGINIA          )
                                  ) ss.

CITY OF ALEXANDRIA       )

I, David Keating, President of the Institute for Free Speech, being first duly sworn, state under oath that I have read the foregoing VERIFIED COMPLAINT, and that the statements contained therein are true and correct to the best of my knowledge, information, and belief.

Subscribed and sworn before me this ___7th___ day of December, 2018.

Notary Public

My Commission Expires: __8|31|21__

Susan Dytrt Bradley
Commonwealth of Virginia
Notary Public
Commission No. 7571751
My Commission Expires 8/31/2021