IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH DAKOTA, CENTRAL DIVISION

| | |
|---|---|
| INSTITUTE FOR FREE SPEECH,<br><br>_Plaintiff_,<br><br>_v._<br><br>JASON RAVNSBORG, in his official capacity as South Dakota Attorney General, and<br><br>STEVE BARNETT, in his official capacity as South Dakota Secretary of State,<br><br>_Defendants_. | Civil Action No. 3:18-cv-3017-RAL<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

Plaintiff, Institute for Free Speech (the "Institute" or "IFS"), by and through its counsel of record, for its Brief in Support of Plaintiff's Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment, states as follows:

### INTRODUCTION

When it granted the motion for preliminary injunction filed by IFS, this Court in its Opinion and Order Concerning Motion for Injunctive Relief, Doc. 21 (Order), noted that "IFS is likely to prevail on the merits of its claim that IFS has a First Amendment right to post its analysis to its website and send it to South Dakota media outlets without incurring criminal liability for foregoing the disclosures set forth in § 12-27-16." _Id_. at 11.  Of course, the Court also speculated that IFS may not fall under South Dakota's disclosure regime, suggesting that IFS might not make the requisite "expenditure" if it used its overhead to produce and distribute its analysis.  _Id_. at 9-12. Subsequent pleadings have clarified this issue.  As noted in its Amended Verified Complaint, Doc.

27 (Complaint), at ¶¶ 21-24, IFS expended over $100 to produce its analysis that was not overhead and therefore had an "expenditure" over $100 even under the Court's preliminary interpretation of that word. Order at 9-10. Consequently, absent the Court's preliminary injunction, IFS would have faced criminal liability for its analysis without disclosures required by § 12-27-16, and without a permanent injunction IFS and others similarly situated face future prosecution chilling core political speech in violation of the First Amendment.[1]

South Dakota has created a constitutionally infirm disclosure regime riddled with vagueness and contradiction.  Individual and corporate persons have the right to publish opinions on matters of pending political and policy questions without the burdens South Dakota places on them: "This is true liberty, when free-born men, having to advise the public, may speak free." Euripides, *Epigraph to* John Milton, *Areopagitica and Other Political Writings* 3 (Liberty Fund, 1999).  The instant lawsuit is informed by Milton's statement on the sanctity of political speech rights, which also inspired James Madison when he drafted the First Amendment, *see* Letter from James Madison to Peter S. DuPonceau (Aug. 1824), in 9 THE WRITINGS OF JAMES MADISON 200 (Gaillard Hunt ed., 1910), and IFS requests the judgment on the pleadings to which it is entitled, so that all can be clearly informed of, or free from, the unconstitutional burdens South Dakota law places on core political speech.

To protect these rights, pursuant to Rules Rule 12(c) and 56 of the Federal Rules of Civil Procedure, and D.S.D. Civ. LR 7.1, 56.1, IFS under Federal Rules of Civil Procedure respectfully

---

[1] As the Court noted in its Order, the state has suggested that it might not prosecute IFS for its publication and for subsequent similar publications.  Order at 8-9.  The state averred as much again in its Amended Answer, Doc. 28, at ¶ 9.  Yet for the reasons the Court noted in its Order: "If this Court were to decline to consider this case based on the Defendants' representations, 'if would be placing [IFS]'s asserted First Amendment rights at the sufferance of [South Dakota's] Attorney General." *Id*. at 9 (quoting *Vermont Right to Life v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (brackets in Court's Order).  Absent the judgment sought in the present motion, or perhaps a consent decree from the South Dakota Attorney General stating that IFS and similarly situated person can be assured of non-prosecution, such parties First Amendment Right would again be placed at the sufferance of the South Dakota Attorney General.

submits this Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment. IFS's brief comports with the factual statement requirement for motions for summary judgment in the event the Court deems it necessary to adjudicate the present motion as one for summary judgment instead of one for judgment on the pleadings.  The Court should grant IFS's motion for the reasons stated herein.

## FACTUAL BACKGROUND AND STATEMENT OF UNDISPUTED FACTS

1.  Plaintiff IFS is a § 501(c)(3) nonpartisan, educational charity dedicated to the defense of the political speech and press rights protected by the First Amendment.  As part of that mission, IFS researches constitutional and practical implications of federal and state compelled disclosure laws, including in the area of campaign finance regulation. Additionally, IFS represents individuals and civil society organizations, *pro bono,* in cases raising First Amendment objections to burdensome regulation of core political speech.  Complaint ¶ 12.

2.  Defendant Jason Ravnsborg, in his official capacity as South Dakota Attorney General, "shall investigate and prosecute any violation of the provisions of" South Dakota's campaign finance chapter. S.D. Codified Laws § 12-27-35. Violation of the specific statute challenged in this action brings criminal penalties, enforceable by the Attorney General. S.D. Codified Laws § 12-27-16(1)(c). Or, "[i]n lieu of bringing a criminal action, the attorney general may elect to file a civil action" to enforce any of the campaign finance laws. S.D. Codified Laws § 12-27-35. The Attorney General also has power to inspect records of potential violators of South Dakota campaign finance law. S.D. Codified Laws § 12-27-3. *Id.* ¶ 13.

3.  Defendant Steve Barnett, in his official capacity as South Dakota Secretary of State, has the power to administer fines for failure to timely file campaign finance reports or for lack of information on such reports. *See*, *e.g.*, S.D. Codified Laws § 12-27-29.2. *Id.* ¶ 14.

3

4.   Since its founding in 2005, IFS has studied and analyzed the effect of various campaign finance proposals and other compelled disclosure laws. As part of its mission, IFS has often used its expertise to craft publications addressing proposed legislation before the people, legislatures, and regulatory agencies nationwide. Campaign finance is a particularly complex area of the law, and expert analysis has proven helpful to make plain the effects (often unintended) of various public policy proposals. *Id*. ¶ 15.

5.   Many of IFS's publications are lengthy, running dozens of footnoted pages and containing citations to cases nationwide. These comments are academic works to add to vibrant public policy discussion among the electorate, not campaign flyers. Examples of past work include comments to the New Mexico Secretary of State and comments to the Idaho legislature. *See* Tyler Martinez, *Constitutional and Practical Issues with New Mexico Secretary of State Revised Proposed Rule 1.10.13 NMAC* (Aug. 29, 2017), http://ifs.org/wp-content/uploads/2017/08/2017-08-29_CCP-Comments_NM_Revised-SoS-Proposed-Rule-1.10.13-NMAC.pdf; Tyler Martinez, *Constitutional and Practical Issues with Idaho H. 573 (2017 Campaign Finance Reform Legislative Work Group Recommendations)* (Feb. 22, 2018), http://www.ifs.org/wp-content/uploads/2018/02/2018-02-22_IFS-Cover-Letter-Comments_ID_H.-573_CFR-Work-Group-Legislative-Recommendations.pdf. *Id*. ¶ 18.

6.   IFS brought this lawsuit because it intended to publish analyses of Constitutional Amendment W and Initiative 24, which were on the November, 2018 ballot in South Dakota. And such publication may trigger registration, reporting, and disclosure requirements of S.D. Codified Laws § 12-27-16, as such lengthy, academic work may be considered as an "independent communication expenditures" under S.D. Codified Laws § 12-27-1(11). *Id*. ¶ 18.

4

7. IFS published its analysis regarding then-pending South Dakota Constitutional Amendment W and Initiative 24 on October 17, 2018, only because this Court entered a preliminary injunction, Doc. 21, which specified that IFS would not face criminal sanction for publishing without the requirements identified in paragraph 6. *Id*. ¶ 21.

8. IFS's analysis referenced in paragraph 7 can be found at: https://www.ifs.org/wp-content/uploads/2018/10/IFS-South-Dakota-Comments-Final-17-Oct-2018.pdf. *Id*. ¶ 22.

9. On October 18, 2018 IFS informed media outlets, both within and without South Dakota, of the publication referenced in paragraph 7 of its analysis by means of an electronically distributed press release. *Id*. ¶ 23.

10. Campaign finance proposals have been before the South Dakota electorate in recent years, this year (in the form of Amendment W and Initiative 24), and likely for years to come. *See, e.g.*, S.D. Sec. of State, *2016 Ballot Questions* 9, https://sdsos.gov/elections-voting/assets/2016%20BQ%20PamphletCover.pdf (discussing Initiated Measure 22, "a measure to revise State campaign finance and lobbying laws"). Campaign finance policy is a perennial issue in South Dakota. *Id*. ¶ 20.

11. IFS had over $100 in expenditures to publish its analysis referenced in paragraphs 7 and 8. These expenses included both internal overhead and an hourly payment to one of the analysis co-authors specifically for his work on the analysis of the publication identified in paragraph 8. *Id*. ¶ 24.

12. IFS will run substantially and materially similar analyses of future South Dakota campaign finance ballot measures in the coming years. *Id*. ¶ 25.

5

13. Based on the amount that was spent on the October 17, 2018 publication, IFS reasonably anticipates that future analyses of South Dakota law will also exceed $100 in expenditures. *Id*. ¶ 26.

14. Given the ambiguities of South Dakota Law, IFS may not publish without immanent fear of prosecution, and because IFS intends to continue to publish in South Dakota this fear is ongoing. *Id*. ¶¶ 27, 25.

15. South Dakota defines an "independent communications expenditure" (ICE) as any "expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person [or] entity" for any "communication[] *concerning* . . . ballot questions." S.D. Codified Laws § 12-27-1(11) (emphasis added).

16. South Dakota broadly defines "Contribution" as a payment "made for the purpose of influencing" an election or "the adoption or defeat of any ballot question." S.D. Codified Laws § 12-27-1(6).

17. "Person" is very narrowly defined as "a natural person." S.D. Codified Laws § 12-27-1(16).

18. South Dakota broadly defines an "entity" as "any organized or unorganized association, business corporation, limited liability company, nonprofit corporation . . . [or] any other entity of any kind, except a natural person that is, has been, or could be recognized by law; or any group of persons acting in concert that is not defined as a political committee in this chapter." S.D. Codified Laws § 12-27-1(15).

19. "[D]onated goods and services" (not otherwise defined) also count towards the $100 reporting threshold. S.D. Codified Laws § 12-27-16(2) (reporting requirements).

20. Any entity that spends more than $100 on an ICE is required to include a disclaimer identifying the entity's top five contributors during the past year. S.D. Codified Laws § 12-27-16(1)(c).

21. The mandated disclaimer is: "This communication is independently funded and not made in consultation with any candidate, public office holder, or political committee." S.D. Codified Laws § 12-27-16(1)(c).

22. The disclaimer additionally must state the name of the organization, web address, and mailing address. S.D. Codified Laws § 12-27-16(1)(a) and (1)(b).

23. Failure to carry such a disclaimer is a "Class 2 misdemeanor" in the first instance and a "subsequent offense within a calendar year is a Class 1 misdemeanor." S.D. Codified Laws § 12-27-16(1)(c).

24. Class 2 misdemeanors carry the possibility of "thirty days imprisonment in a county jail or five hundred dollars fine, or both." S.D. Codified Laws § 22-6-2(2). Class 1 misdemeanors carry a year imprisonment in county jail and $2000 fines. S.D. Codified Laws § 22-6-2(1).

25. Officers of IFS would also be disclosed, as South Dakota requires "the name and title of the person [*i.e.* natural person] filing the report, the name of its chief executive, if any, and the name of the person [*i.e.* natural person] who authorized the expenditures on behalf of the entity." S.D. Codified Laws § 12-27-16(3)(b).

26. These requirements are mandatory under South Dakota law regardless of whether the person, partner, owner, trustee, beneficiary, participant, shareholder, or member who own, controls or comprises ten percent or more of IFS, or IFS's chief executive agrees with the analysis IFS publishes.

27. In publishing its analysis of Constitutional Amendment W and Initiative 24, and in future similar analyses, IFS exercises its freedoms protected by the Speech, Press, and Assembly Clauses of the First Amendment to the United States Constitution. *See Citizens United v. Gessler*, 773 F.3d 200, 212, 215-16 (10th Cir. 2014) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352, 366-67 (2010)).

28. S.D. Codified Laws § 12-27-1(11) defines an "independent communications expenditure" as:

> an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication concerning a candidate or a ballot question which is not made to, controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee.

29. Organizations like IFS cannot get regulatory guidance either from the Secretary of State or from the Attorney General. Consequently; there is no safe harbor for IFS before it wishes to speak. IFS's voice is silenced until it knows if it is subject to compelled donor disclosure and other burdens. Complaint ¶¶ 51-56.

## ARGUMENT

### A. Legal Standards

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

> A motion for judgment on the pleadings should be granted when, accepting all facts pled by the nonmoving party as true and drawing all reasonable inferences from the facts in favor of the nonmoving party, the movant has clearly established that no material issue of fact remains and that the movant is entitled to judgment as a matter of law.

*Schnuck Markets, Inc. v. First Data Merchant Services Corp.*, 852 F.3d 732, 737 (8th Cir. 2017) (citing *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004)). Rule 12(c) also provides that if matters outside the pleadings are considered, the court may convert the motion for judgment on

the pleadings to a motion for summary judgment. Pleadings include the complaint and answer. Fed. R. Civ. P. 7(a). Written instruments which are exhibits to a pleading are considered a part of the pleading. Fed. R. Civ. P. 10(c).

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Lincoln Benefit Life v. Wilson*, 907 F.3d 1068, 1074 (8th Cir. 2018).

The initial burden is placed on the moving party. *City of Mt. Pleasant, Ia. v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *accord Lincoln Benefit Life*, 907 F.3d at 1074.

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000); *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury

---

[2] "A plaintiff's verified complaint is the equivalent of an affidavit for purposes of summary judgment . . . ."
*Robertson v. Hayti Police Dep't*, 241 F.3d 992, 994 (8th Cir. 2001).

could return a verdict for the nonmoving party." *Herring*, 207 F.3d at 1029 (quoting *Anderson*, 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact, *see Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

### B. Merits Argument: Introduction

Among its other activities, IFS publishes studies concerning the impact of proposed government policies on citizens' rights of "core political speech." Complaint ¶¶ 12, 15-27. South Dakota Laws unconstitutionally restrict those rights. IFS brought the current action because South Dakota Laws inhibited IFS's planned legal analysis of those measures—*not political ads*, but rather a substantial publication that would examine the measures at length and would not urge voters to cast their ballots in any particular way. *Id*. This Court granted IFS's motion for preliminary injunction, which enabled IFS to publish its analysis without fear of criminal prosecution or compliance with identified unconstitutional conditions. *See* Order. IFS brings the current motion so it and others similarly situated can publish analyses of pending or proposed South Dakota law without fear of application of unconstitutional conditions and fear of criminal prosecution that unconstitutionally chills such core political speech.

South Dakota law burdens IFS's publication in two ways. At the outset, existing regulations—specifically, the state's effort to regulate any "communication[] *concerning* . . . ballot questions"—pose insurmountable vagueness problems and sweep far broader than can be justified by any relevant governmental interest. S.D. Codified Laws § 12-27-1(11) (emphasis added). Second, these laws unconstitutionally require IFS to convey the government's message, including

a list of its top five contributors. Because South Dakota does not require any connection between a listed donor and the regulated communication, this requirement will inevitably capture donors who gave to generally support IFS, and who had no involvement with, or even prior notice of, IFS's publication. Consequently, listing them as the "sponsors" of IFS's published work will affirmatively mislead the public, while necessarily doing nothing to help inform the state's voters. The First Amendment does not permit the state to impose these burdens on the right to speak and publish, and the requirement is under the circumstances unconstitutional state-compelled speech.

Fifty-three years ago, in *Mills v. Alabama*, the Supreme Court noted: "Whatever differences may exist about interpretation of the First Amendment, there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion of governmental affairs. This of course includes discussion of . . . structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." 384 U.S. 214, 218-19 (1966). The *Mills* case concerned an instance where the Court found unconstitutional criminal liability for an editor, who published an editorial on election day, when Alabama law made it a crime "'to do any electioneering or to solicit any votes . . . in support of or in opposition to any proposition that is being voted on on the day on which the election affecting such candidates *or propositions is being held*.'" *Id*. at 216 (emphasis added) (quoting the then contemporary section of the Alabama Corrupt Practices Act). The Court easily found these measures unconstitutional under the First Amendment's Press and Speech Clauses. *Id*. at 219. "The Constitution specifically selected the press, which includes not only newspapers, books and magazines, but also humble leaflets and circulars [] to play an important role in the discussion of public affairs." *Id*. That role is specifically at issue in this case, as IFS's publications

11

face regulatory chilling of IFS's core speech and press rights, and the South Dakota Law regarding disclosure is under the facts of this case unconstitutionally state-compelled speech.

Forced publication of statements, as at issue here, must meet strict scrutiny, as the Court has recently reminded us. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. __; 138 S. Ct. 2361, 2371 (2018) [hereinafter *NIFLA*]. Thus, even though *Mills* involved a criminal *ban*, rather than *a burdening regulatory regime* that carries criminal penalties—at issue here, strict scrutiny applies in this case as the Supreme Court has made clear in the Press and Speech Clause contexts that: "We have held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all." *Janus v Am. Fed'n of State, Cty. & Mun. Emps. Council 31*, 138 S.Ct. 2448, 2463 (2018) (*quoting Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In addition, "[i]t is important to underscore that [this case is] about the production and dissemination of a [perspective on pending policy measures submitted to the public], and not about contributions to a candidate, party, political organization, or political action committee (PAC)." Michael W. McConnell, "Reconsidering *Citizens United* as a Press Clause Case, 123 YALE L. J. 412, 416 (2013) [Hereinafter "McConnell Article"]. As such, it is important to note that every Justice on the Court in *Citizens United*—but for Justice Kennedy who was silent on the matter— noted strict scrutiny would apply to governmental regulation of press containing political speech, which is at issue in IFS's scholarly publication. *See* 558 U.S. at 372-73 (Roberts, C.J. and Alito, J. concurring); *id*. at 390 (Scalia, J., concurring, joined by Alito and Thomas, J.J.); *id.* at 431 n.57 (Stevens, J., joined by Ginsburg, Breyer and Sotomayor J.J., concurring in part and dissenting in part). Because the on-communication disclaimer is a "government-drafted script[]," *NIFLA,* 138 S. Ct. at 2371 (2018), "proscribing the content of" IFS's publication, it is "subject to traditional strict scrutiny." *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 987 (9th Cir. 2004). The

ban in *Mills* versus the coerced-via-government-regulation publication here is to the same effect: it substitutes the state's message—even if that message is silence, as in *Mills*—upon the proposed publication. "Suppression of the right of the press . . . to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills*, 314 U.S. at 219.

IFS and others similarly situated face muzzling by South Dakota. Similar to the editor and editorial at issue in *Mills*, IFS published analyses of two pending South Dakota ballot measures: Constitutional Amendment W and Initiated Measure 24. Complaint ¶¶ 21-22. IFS will continue such publication activity in South Dakota. *Id*. ¶¶ 25-26. Commentary by publication "serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills,* 384 U.S. at 219. South Dakota has criminal penalties that as described below run afoul of the First Amendment to the United States Constitution and are further unconstitutionally vague as they would impose criminal liability on political speech under circumstances in which IFS is engaging. Complaint ¶¶ 29-50. Consequently, the present motion asks for declaratory and injunctive relief regarding application of those laws in the form of a judgment that grants permanent declaratory and injunctive relief. *Id*. Prayer for Relief.

IFS is entitled to judgment on the pleadings setting aside the South Dakota provisions because: (1) (A) IFS's publication, and intended publications, constitute press subject to protections under the Press Clause of the Constitution, which South Dakota Laws violate by abrogating, inhibiting, and chilling—without sufficiently narrow tailoring and without a compelling governmental purpose necessary to survive strict scrutiny—IFS's ability to publish its

analyses of South Dakota proposed ballot measures; (B) South Dakota Laws constitute compelled speech and are subject to strict scrutiny under the First Amendment's Speech Clause, particularly given recent clarification of the compelled speech doctrine, and as such South Dakota Laws violate the Constitution's Speech Clause; (C) South Dakota Laws cannot meet the standards of exacting scrutiny even if the Court finds them applicable to a Speech Clause analysis in this case; and (2) South Dakota's Laws are unconstitutionally vague under the First Amendment and the Fourteenth Amendment's Due Process Clause of the United States Constitution. These principles are analyzed in turn.

1. **South Dakota Law Violates First Amendment Protections.**

IFS's publication analyzing Constitutional Amendment W and Initiative 24 constituted press protected by the First Amendment's safeguards for Speech, Association and the Press. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352, 366-67 (2010)); *accord Citizens United v. Gessler*, 773 F.3d 200, 212, 215-16 (10th Cir. 2014). South Dakota Laws violate IFS's protections under the First Amendment, as IFS's planned publication activities are unconstitutionally regulated and chilled by operation of South Dakota Laws.  This Court's Order expressly recognized that fact. Order at 11. The First Amendment provides that: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of people to peaceably assemble," U.S. Const. Amend. I, and that prohibition is equally binding upon South Dakota by incorporation against the several states under the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).  This Court could and should rule for IFS on the basis of any or all of the three following grounds for concluding South Dakota Law runs afoul of the First Amendment.

14

Although this Court, particularly at the hearing on IFS's motion for preliminary injunction, analyzed the issues presented as governed by campaign finance precedent, this should not be the case.  That precedent does not, and should not, apply to a case, such as this, when the speech at issue is in fact an academic paper or pamphlet and not the propagandistic advertisements to which campaign finance regulation is designed to apply.  As discussed below, the speech at issue in this case is core political speech and press to which strict scrutiny should apply, and not the narrow exception of campaign finance issues which are subject only to exacting scrutiny.  Moreover, because the on-publication disclaimer mandated by South Dakota Laws is compelled speech, regulating an instance of core political speech, it is as such subject to strict scrutiny as well.  This point is also addressed below.  Finally, even were this Court to conclude that campaign finance regulation applies, and therefore the South Dakota Laws must meet exacting scrutiny, they do not meet that test either, and IFS is entitled to judgment on the pleadings or summary judgment even under the exacting scrutiny standard.

### A. The Press Clause: Criminal Penalty Regulation of Publication and Strict Scrutiny

With respect to the First Amendment's protections in general, and those of the Press Clause in particular, the Supreme Court has made it plain that as an original matter "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by [inhibiting the] free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 167-68 (2002) (citations and internal quotation marks omitted). "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. Griffin*, 303 U.S. 444, 452 (1938). That is because:

> There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. *We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers*.

*Gessler*, 773 F.3d at 212 (quoting *Citizens United*, 558 U.S at 352) (emphasis in *Gessler*).[3] Press Clause analysis carries with it a strict scrutiny analysis. *See, e.g.*, *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1146 (D.N.D. 2012); *accord* McConnell Article at 446-47 (explaining that candidate contribution regulation triggers exacting scrutiny while Press Clause analysis triggers appropriate strict scrutiny).

As noted above, the on-publication disclaimer is government mandated speech that changes the content of the speech at issue and is therefore subject to strict scrutiny. *NIFLA*, 138 S. Ct. at 2371; *Heller*, 378 F.3d at 987. And as counsel has noted here, and at the hearing on the motion for preliminary injunction, the required disclaimers may, in fact, mislead the South Dakota public, because there is no logical correlation between general funders of IFS—and like organizations—and particular publications IFS produces. Those generally donating to IFS may or may not agree with a particular analysis IFS publishes and consequently there is no informational interest served by including them in on-publication disclaimers. South Dakota Laws thus cannot survive the strict scrutiny warranted by the Press Clause analysis and IFS is therefore entitled to a judgment on the pleadings or summary judgment.

### B.    The Speech and Assembly Clauses: Coerced Speech and Strict Scrutiny

The same result obtains under analysis pursuant to the Speech and Assembly Clauses of the Constitution. As noted, there is a difference between disclosure that is mandated as part of an

---

[3] Indeed, the state, "by adopting media exemptions, expresses an interest not in disclosures relating to *all* electioneering communications and independent expenditures, but only in disclosures by persons unlike" the government's preferred speakers. *Id*. at 217 (emphasis in *Gessler*). Thus, the media exemption "cast[s] doubt on the validity and extent of the asserted governmental interest" in the first place. *Id*. at 216.

after-action report, as opposed to the on-communication publication of donors demanded by S.D. Codified Laws § 12-27-16(1)(c). Complaint ¶ 35. Because the on-communication disclaimer is a "government-drafted script[]," *NIFLA* , 138 S. Ct. 2361, 2371 (2018), "proscribing the content of" IFS's publication, it is "subject to traditional strict scrutiny." *Heller*, 378 F.3d at 987. The Court has left no doubt that the First Amendment cabins the government's power to compel speech no less than it does the power to restrict speech: "We have held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus*, 138 S. Ct. at 2463 (2018) (*quoting Wooley*, 430 U.S. at 714); *accord Rumsfeld v. Forum for Acad. Institutional Rights*, Inc., 547 U.S. at 61 (2006) ("[F]reedom of speech prohibits the government from telling people what they must say."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1985) (plurality opinion)); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 536, 559 (1985).  This understanding of the Free Speech Clause reflects the recognition that requiring a speaker to disseminate a message that is not his own may, in fact, deter him from speaking at all—as is the central complaint in this very case— "thereby reducing the free flow of information and ideas that the First Amendment seeks to promote." *Pac. Gas & Elec.*, 475 U.S. at 14.  This last concept intersects with the second, as any law that compels speech "necessarily alters the content of the speech." *Riley v. Nat'l Fed. of Blind of N.C.,* 487 U.S. 781, 795 (1988).

It follows, then, that laws compelling speech are treated as content-based and are subject to strict scrutiny.  *See id.*; *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *Stuart v. Loomis*, 992 F.Supp.2d 585, 592-93 (M.D.N.C.

2014).  Indeed, this was a large part of the Court's recent point in the *Janus* decision. 138 S.Ct. at 2462-64.  And as the Ninth Circuit determined when it struck a law that "required certain groups or entities publishing 'any material or information relating to an election, candidate[,] or any question on a ballot' to reveal *on the publication* the names and addresses of the publications' financial sponsors," there is a constitutional difference between "the reporting of funds used to *finance* speech," via after-the-fact reporting, as opposed to compelled disclosures "affect[ing] the *content of the communication itself*." *Heller*, 378 F3d. at 981, 987 (emphases in original, quoting relevant statute). This ruling is in complete accord with the Court's caselaw just discussed.  The fundamental "distinction between on-publication identity disclosure requirements and after-the-fact reporting requirements" is "constitutionally determinative," and necessitates a more rigorous standard of review of strict scrutiny of South Dakota's disclosure requirement in S.D. Codified Laws § 12-27-16(1)(c).  *Heller*, 378 F.3d at 991; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

Consequently, South Dakota Laws generally cannot survive the requisite strict scrutiny and the on-communication requirement of S.D. Codified Laws § 12-27-16(1)(c) is compelled speech that cannot survive strict scrutiny. Overall, South Dakota Laws cannot be applied to the IFS's attempts to inform the public and further policy debate through its publications because the laws are not sufficiently tailored and do not serve a compelling governmental interest. Nowhere do South Dakota Laws identify interests even remotely relevant to the disclosure requirements identified, either in S.D. Codified Laws §§ 12-27-1, 12-27-16, or in the criminal enforcement provisions for those sections and subsections, S.D. Codified Laws § 12-27-16(1)(c), 22-6-2(1)-(2).

18

Presumably, South Dakota may attempt to defend its Laws by stating that the disclosure requirements are justified by attempting to discern who is attempting to influence voters and discouraging corruption by making large independent expenditures known to the public, so citizens can make informed decisions in the political marketplace. Neither of these interests justify the scope of South Dakota Laws nor would they satisfy the strict (or even, as discussed below, the exacting scrutiny) necessary to find those laws constitutional.

That is because "'[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.'" *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) ("*WRTL II*") (Roberts, C.J., controlling opinion) (quoting *First Nat'l Bank i*, 435 U.S. at 776) (ellipsis in *WRTL II*, brackets added). These principles reflect the "'national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Buckley*, 424 U.S. at 14 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The Supreme Court has also emphasized that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and that there is a "vital relationship between freedom to associate and *privacy in one's associations*." *NAACP*, 357 U.S. at 460-61, 462 (emphasis added).

This language recognizes two rights: "(1) the right to engage in publicized debate concerning public policies and issues, and, to effectuate that right, (2) the right to associational privacy. Freedom of association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," such as registration and disclosure requirements and the attendant sanctions for failure to disclose. *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that

the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions").

As explained in both *Buckley* and *Citizens United*, the only interest that the government can assert to justify its disclosure requirements is the informational interest. *Buckley*, 424 U.S. at 81; *Citizens United*, 558 U.S. at 367. But this interest is not present here because IFS's publication is not campaign related or candidate-related speech; it is a scholarly, footnoted consideration of ballot measures: this is directly the stuff of the Founder's pamphleteering and there is no case under those conditions that justifies the forced disclosure demanded by South Dakota Laws. The informational interest does not justify every regulation that the government asserts might provide some information to the government or the public. That is, its scope covers only specific information about specific political activity, not any information about politics or candidates. The government tried to obtain such broad information in *Buckley*, attempting "to achieve 'total disclosure' by reaching 'every kind of political activity' in order to ensure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." *Id*. at 76 (citations omitted). The *Buckley* Court recognized, however, that these broad aims coupled with vague provisions engendered the "potential for encompassing both issue discussion and advocacy of a political result," thus "reach[ing] groups engaged purely in issue discussion." *Id*. at 79. And while the Court in *McConnell v. Fed. Election Comm'n* somewhat narrowed the *Buckley* Court's holding regarding overbreadth, *Buckley*'s holding on the vagueness doctrine in the area of political speech remains completely intact. *See*, *e.g.*, 540 U.S. 93, 121 (2003). Additionally, as subsequent courts have noted, the anticorruption and anticircumvention interests – which might logically apply in the candidate funding context – simply do not in the context of funding speech on political issues not associated with candidate funding. *See Citizens*

20

*Against Rent Control v. Berkeley*, 454 U.S. 290, 296-97 (1981); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 790-92 (1978). As the cases just cited explain, the anticorruption interest simply does not apply in this context because this case involves a pure issue of political speech publication. *See id.*

In expressly addressing the evil of inhibiting issue speech like the Institute's proposed publications, the *Buckley* Court deemed disclosure appropriate *only*:

> (1) when [organizations] make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, *and* (2) when [organizations] make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.

*Id.* at 80 (emphasis added). That interest is absent here, and the associational and speech privacy rights are also neither protected (nor taken into account) by South Dakota Laws' broad reach.

That is precisely the problem with the South Dakota Laws. They reach IFS, a group purely engaged in issue discussion, and impose disclosure rules, with the force of criminal penalties, and with no tailoring to satisfy the demands of exacting scrutiny when restricting groups like IFS, in addition to possible other groups whose speech is informational and in no way a source of corruption. To make matters worse, the South Dakota Laws make no attempt to tailor their requirements to protect the associational interests identified above. As such, they cannot meet the constitutional requirements of strict scrutiny—for the compelled speech of S.D. Codified Laws § 12-27-16(1)(c)—and IFS is entitled to a judgment on the pleadings on Count One of the Complaint.

## C. The Speech and Assembly Clauses: Exacting Scrutiny

With respect to speech and association in this context, under the Speech and Assembly Clauses of the Constitution, Supreme Court precedent makes clear: "[t]he constitutional right of

association . . . stem[s] from the . . . recognition that '[e]ffective advocacy of both public and private points of view . . . is undeniably enhanced by group association.'" *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). Acting to safeguard this associational liberty, commonly known as the freedom of assembly protection by the Assembly Clause, the Court noted explicitly that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Id*. at 66. The Court was further concerned with "the invasion of privacy of belief" generated by disclosure, given that "'[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.'" *Id*. (quoting *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring)).

In *NAACP v. Alabama*, the Supreme Court protected the right to privacy of association—there from disclosure of an organization's contributors—by subjecting "state action which may have the effect of curtailing the freedom to associate . . . to the closest scrutiny." 357 U.S. at 460-61; *see also id*. at 462 (noting that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective . . . restraint on freedom of association"). In *Buckley*, the Supreme Court directly addressed both the associational rights discussed in *NAACP v. Alabama* and the "[d]iscussion of public issues," 424 U.S. at 14—now referred to as "issue advocacy" or "issue speech." *McConnell v FEC*, 540 U.S. 93, 190 (2003). The precedent requires "that the subordinating interests of the State . . . survive exacting scrutiny." *Id*. at 64 (footnote omitted, collecting cases).

In assessing the constitutionality of South Dakota Laws' disclosure requirements, even if this Court should find that campaign finance precedent applies (though it should not for the reasons already explained), this Court at minimum inquires whether they satisfy exacting scrutiny, as this is the standard the Supreme Court indicates is applied to such requirements. *See*, *e.g.*, *Doe v. Reed*,

561 U.S. 186, 196 ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'"); *Citizens United*, 558 U.S. at 366 ("The Court has subjected [disclaimer and disclosure] requirements to exacting scrutiny" (internal quotation marks omitted)); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008) (governmental interest in disclosure requirements "must survive exacting scrutiny" (internal quotation marks omitted)); *Buckley*, 424 U.S. at 64 ("Since *NAACP v. Alabama* [357 U.S. 449 (1958),] we have required that the subordinating interests of the State [in compelled disclosure] survive exacting scrutiny.").

Therefore, "when the law at issue is a disclosure law, . . . it is subject to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Minnesota Citizens*, 692 F.3d at 874-75 (Supreme Court citations and internal quotation marks omitted). For the law to pass muster there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United*, 558 U.S. at 366–67 (internal quotation marks omitted). "That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Reed*, 561 U.S. at 196 (internal quotation marks omitted). Exacting scrutiny is not a constitutional pass on regulation of political speech, as one court recently noted:

> We are mindful, of course, that the "closely drawn" standard is not a strict-scrutiny standard. Legislators have some latitude in determining how to craft limits on campaign contributions, given that, as an empirical matter, courts are without a "scalpel to probe" where the contours of a minimally restrictive limit might lie. *Buckley*, 424 U.S. at 30. *But neither can we stand by while the patient is euthanized*. The statute here restricts the First Amendment rights of nearly 100,000 Medicaid providers who do not commit fraud, based on an attenuated concern about a relative handful of providers who do. There is no avoiding the conclusion that the contribution ban set forth in § 3599.45 is not closely drawn. The ban is therefore unconstitutional.

*Lavin v. Husted*, 689 F.3d 543, 548 (6th Cir. 2012) (emphasis added) (Kethledge, J.). "As the Supreme Court recently reiterated when reviewing a disclosure law, 'there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed and the governmental interest must survive exacting scrutiny.'" *Minnesota Citizens*, 692 F.3d at 876 (citing *Davis*, 554 U.S. at 744 and quoting *Buckley*, 424 U.S. at 64).

As noted above, the on-publication disclosures may indeed in the context of individual publications actually mislead the South Dakota public because individual contributors or donors may or may not agree with the particular views express in a particular IFS publication.  South Dakota law makes no provision for this contingency and fails to tailor its laws for it at all.  South Dakota law, consequently, does not meet exacting scrutiny.  Such forced disclosure that can actually mislead, and it cannot meet exacting scrutiny because there is *no* governmental interest in forcing publication of false information.

## 2. <u>South Dakota Laws Are Unconstitutionally Vague</u>.

Before this Court's Order, IFS had no way of knowing whether it must comply under the ICE requirements of South Dakota Laws or face criminal penalties, and whether by some chance interpretation they might avail themselves of the media exceptions identified above. The combination of both provisions engenders unconstitutional vagueness in South Dakota Laws.  IFS, as described above, has no recourse to seek safe harbor, or even guidance, from South Dakota's Attorney General or Secretary of State. Complaint ¶¶ 51-56. And due to the preliminary nature of the Court's relief, it must chance criminal penalties if it is to speak in the future. This is precisely the problem the vagueness doctrine is designed to address. It is the reason South Dakota Laws are unconstitutionally vague. And this Court should find IFS is entitled to judgment on the pleadings or summary judgment on the alternative constitutional claim in Count Two of the Complaint.

Both the First and Fourteenth Amendment protect citizens from regulations, particularly those carrying criminal penalties, that are unconstitutionally vague. U.S. Const. Amends. I, XIV; *see generally Thomas v. Collins*, 323 U.S. 516 (1945) ("No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. In short, the supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning."). South Dakota campaign finance law impermissibly blurs the line between express advocacy, which may be regulated, and discussions of policy and issues, which generally cannot. *See Buckley*, 424 U.S. at 42. The vagueness problem is clear: government action unconstitutionally chills speech when it "blanket[s] with uncertainty whatever may be said[, compelling a] speaker to hedge and trim." *Id*. at 43 (quoting *Thomas*, 323 U.S. at 535).

Unconstitutional vagueness is apparent of the face of a statute or statutory scheme. *See id.* at 40-41, n.48. The Supreme Court has repeatedly held that "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *WRTL II.*, 551 U.S. at 468-469 (Roberts, C.J., controlling op.) (quoting same); *In re Primus*, 436 U.S. 412, 432 (1978) (quoting same); *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (quoting same); *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting same). For instance, in *Rankin v. McPherson*, the Supreme Court held that discussion of public policy must also be protected with this same "breathing space." 483 U.S. 378, 387 (1987) ("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected." (quoting *Bond v. Floyd*, 385 U.S. 116, 136 (1966))). Indeed, when it comes to discussion of policy,

"debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270.

To give "First Amendment freedoms [the] breathing space [they need] to survive, government may

regulate . . . only with *narrow specificity*." *Keyishian*, 385 U.S. at 604 (emphasis added, citations

omitted). Vagueness is especially dangerous in the First Amendment context. *Buckley*, 424 U.S.

at 77 ("[A]n even 'greater degree of specificity' is required" when "First Amendment rights are

involved . . . ." (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974))).

> Here, South Dakota Laws define an "independent communications expenditure" as:
>
> an expenditure, including the payment of money or exchange of other valuable consideration or promise, made by a person, entity, or political committee for a communication concerning a candidate or a ballot question which is not made to, controlled by, coordinated with, requested by, or made upon consultation with that candidate, political committee, or agent of a candidate or political committee.

S.D. Codified Laws § 12-27-1(11).

Defining a category of regulable speech as "concerning a candidate or a ballot question" is

unclear in the ballot initiative context. Does speech fall under South Dakota Laws' regulation as

"concerning . . . a ballot question" only if it specifically discusses a ballot question by title, such

as with IFS's commentary on Amendment W? What if a publication merely mentions the title?

What about talking about campaign finance regulation generally? Is discussing the constitutional

concerns of banning American citizens from speaking—simply because they are from out-of-

state—a discussion of a ballot question? Answering these questions is difficult, if not impossible,

for IFS, especially when so many key terms are undefined. *See* Complaint ¶¶ 88-103.

With respect to language in this arena containing regulations wishing to reach speech

activities "concerning" or "relative to" election issues, the Supreme Court has found such

provisions essentially vague *per se*. *Buckley*, 424 U.S. at 79-80. As such, South Dakota Laws

expressly pose a trap for the unwary. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)

("Vague laws may trap the innocent by not providing fair warning"). And, as discussed above,

organizations like IFS cannot get regulatory guidance from either the Secretary of State or the Attorney General. *See* Complaint ¶¶ 51-56. Consequently, there is no safe harbor for IFS before it wishes to speak. IFS's voice is silenced until it violates the law and enforcement proceedings begin. And as this Court noted, a mere assurance from the South Dakota Attorney General does not suffice in this area. *See supra*, note 1.

Because the definition is so vague and broad, S.D. Codified Laws § 12-27-1(11) functions as "a content-based regulation of speech" which is "of special concern": "The vagueness of . . . a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-872 (1997); *cf. Fed. Commc'ns Comm'n v. Fox TV Stations, Inc.*, 567 U.S. 239, 254-255 (2012) (applying *Reno*). The remedy for vagueness is facial relief, the appropriateness of which is determined by analyzing the statute's effect on complainant's proposed conduct. *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Id*. at 498. Here, the law concerns the discussion of public policy and is therefore at the height of the First Amendment's protections. *Republican Party v. White*, 416 F.3d 738, 748 (8th Cir. 2005) (en banc) ("Protection of political speech is the very stuff of the First Amendment."). Because it makes speakers like IFS hedge and trim their speech, S.D. Codified Laws § 12-27-1(11) should be declared facially void for vagueness, as should the attendant criminal enforcement provisions, to the extent they support prosecutions under § 12-27-1(11), for violating that provision.

## CONCLUSION

In light of the foregoing, Plaintiff respectfully requests the Court enter an Order granting IFS judgment on the pleadings or summary judgment, permanently enjoining application of the South Dakota Laws, as well as IFS's other Prayers for Relief.

Dated this 31st day of January, 2019.

Respectfully submitted,

REDSTONE LAW FIRM LLP


 _/s/ Lisa M. Prostrollo_____
Lisa M. Prostrollo
101 N. Phillips Ave., Suite 402
P.O. Box 1535
Sioux Falls, SD 57101-1535
Telephone: (605) 331-2975
Facsimile: (605) 331-6473
lisa@redstonelawfirm.com


Parker Douglas*
Allen Dickerson*
Institute for Free Speech
124 S. West Street, Suite 201
Alexandria, VA 22314
Telephone: (703) 894-6800
Facsimile: (703) 894-6811
adickerson@ifs.org
pdouglas@ifs.org
 *Admitted Pro Hac Vice

*Counsel for Plaintiff Institute for Free Speech*

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2019, I electronically filed the Brief in Support of Plaintiff's Motion for Judgment on the Pleadings, or, in the Alternative, for Summary Judgment with the Clerk of the Court for the United States District Court for the Central Division by using the CM / ECF system.  Participants in the case who are registered CM / ECF users will be served by the CM / ECF system.


_/s/ Lisa M. Prostrollo_____
Lisa M. Prostrollo


**CERTIFICATE OF COMPLIANCE**

In accordance with Local Rule 7.1(B), I certify that this Brief in Support of Plaintiff's Motion for Judgment on the Pleadings, or in the Alternative, for Summary Judgment complies with the requirements set forth in the Civil Local Rules of Practice for the District Court of South Dakota.  This brief was prepared using Microsoft Word and contains 8,893 words.  I have relied on the word and character count of the word-processing program to prepare this certificate.


_/s/ Lisa M. Prostrollo_____
Lisa M. Prostrollo